M'Neely *v.* Woodruff.

ROBERT M'NEELY and OTHERS v. GEORGE WOODRUFF and OTHERS.

Should the president and directors of an incorporated company neglect to notify an election to be held within thirty days after the day designated in the charter, as required by the act of the 8th December, 1825, such neglect will not be a forfeiture of their charter, but the stockholders may compel the directors to do their duty by mandamus, or otherwise, immediately. The act of 1825 was not intended to impair the charter right of holding an election at any time, but to hasten and quicken the directors in using it, and by putting it in the power of the stockholders to compel them to do it, if they should neglect for thirty days.

The directors of a bank may order instalments to be paid on the shares of stock, for the purpose of " defraying incidental expenses," in the recovery of the funds of the institution, and if the stockholders neglect, or refuse to pay such instalments, the directors may legally forfeit the shares, and the right of voting upon such shares no longer exists.

Stock belonging to the company cannot be voted upon, in choosing directors for that company, by any body.

Though in the election of directors, illegal votes may have been admitted, and legal votes rejected, yet if a majority of legal votes still appears for those who are returned, the election shall be established.

*W. Halsted,* made an application to this court in the term of May last to set aside the election of directors of the State Bank at Trenton, upon an allegation that the same had been illegally holden and conducted. He read the act of the 8th of December, 1825, " to prevent fraudulent elections by incorporated companies and to facilitate proceedings against them." He read also affidavits disclosing the manner in which the election had been conducted, and the resolution of the board of directors in regard to the instalments called in. He contended, 1. That the election was holden at an improper time. It is true that the charter uses the words at " any time," but these words were constructively repealed by the act of 1825, which directed an election to be notified within thirty days after the day fixed by the charter for the election. The directors have neglected the duty thus required of them, and they have no power to call afterwards for an election.

2. The power given to the directors in the bank charter, to forfeit shares for the payment of instalments, is to be construed strictly, and to be confined to such as are intended to create banking capital, and to carry on banking operations. Forfeitures are odious, and will never be allowed beyond the letter of the grant. *Thomas Co. Litt.* 778, *note.* A corporation has only

M'Neely *v.* Woodruff.

such powers as are expressly given, or are necessary to carry on their proper operations, 5 *Con. Rep.* 558; 2 *Cranch R.* 157; *Angel on Cor.* 139; 15 *John. Rep.* 583. The instalments of fifty and twenty-five cents were called in, not for banking purposes, but after the failure of the bank. They were called in, as appears by the resolution of the board of directors, for the purpose of paying incidental expenses; and were applied to the prosecution of the old board of directors. As the directors had no right to call for these instalments, they had no right to forfeit the shares for their non payment, and the owners of them had a right to vote on them. As these votes were rejected, the election ought to be set aside.

3. The election was illegal because the inspectors of the election did not require the production of the transfer book as the best evidence of the right to vote. He contended, that this was made indispensably necessary by the 5th section of the act of 1825. The cashier produced nothing but a list of the stockholders entitled to vote, which was not sufficient.

4. The election was illegal, because the inspectors admitted fifty votes given by Mr. Woodruff. He was not the owner of the shares on which the votes were given; they belonged to the company, and had been transferred to him, as president, to sell them for the benefit of the company. It is settled, that stock belonging to the whole company cannot be voted upon in choosing directors for that company, 5 *Cowen's Rep.* 425, 6; 7 *Cowen,* 402; 1 *Wendal R.* 98.

*Saxton,* contra. 1. The election was not holden in 1830, on account of the sickness and non attendance of the judges appointed to conduct it, but the power to hold an election of directors at any time still exists, notwithstanding the act of 1825. The charter confers that privilege, and the legislature could not, by a subsequent act, impair it. *Angel and Ames on Corporations,* 503; 4 *Wheat. R.* 518; 6 *Cranch R.* 88. If there can be no election after the thirty days, the old directors must continue for life. If the power to hold a legal election expired with the thirty days, this court cannot order a new election, and this application must fail. Such are some of the consequences incident to the constructive repeal of this part of the bank charter. But the provisions of the charter, and the act of 1825, may be re-

conciled. If the directors neglect to notify within thirty days, the stockholders may apply to this court for a mandamus, and compel them to perform their duty. And this is the true meaning of all that is contained in the act of 1825 on this subject. But there was in fact no irregularity, or illegality, in this election; for all parties waited until the time of the next annual election, when it took place agreeably to the charter. *Angel and Ames on Corp.* 75, 76, 276, 7, 8; 2 *Pen. R.* 1050; 6 *Cowen's R.* 23; 2 *Kent's C.* 288; 9 *John. R.* 147; 1 *Page C. R.* 597.

2. The board of directors had a right to call upon the stockholders for additional instalments. They had paid but thirty. dollars on each share, and by their subscription they were bound to pay fifty. These instalments were to be applied to legal purposes. The funds of the institution were out, and must be recovered, or the bank could never resume its operations. The stock was a fund for payment of debts and expenses, *A. and A. C.* 355. The directors had a right to call in the bank instalments to defray expenses of prosecuting for and collecting monies due to the institution. The stockholders were thus bound to pay the instalments when called for, and as they did not, their shares were properly and legally forfeited; and being forfeited they had no right to vote on the shares.

3. The transfer book is only required to be produced, where the right of voting upon the shares is questioned. The inspectors of the election did not require the transfer book, because the right of the applicant to vote, was not questioned. The cashier admitted the right to vote, and that the omission on his list was a mistake.

4. If the votes given by the president on the shares belonging to the company should be rejected as illegal, yet it is manifest the directors have still a majority of the votes, and are duly elected. This court will not disturb the election of the directors, if after rejecting all the illegal votes, and admitting the legal votes, it still appears that the directors returned have a majority of the lawful votes, 7 *Rowen's R.* 153. For if a new election is ordered, it must result in the same way.

The opinion of the court was delivered at the last September term by Justice Ford.

FORD, J. Robert M'Neely and others, owners of stock in the State Bank at Trenton, applied to this court to set aside the election of George Woodruff, and nine other persons, to the office of directors, upon an allegation that the election had been illegally holden and conducted. An act of the 8th of December, 1825, " to prevent fraudulent elections by incorporated companies, and to facilitate proceedings against them, " declares it shall be the duty of the Supreme Court, upon the application of any person or persons who may complain of any election, to proceed forthwith, and in a summary way to hear the affidavits, proofs and allegations of the parties, and thereupon establish the election so complained of, or order a new election, or make such order, or give such relief in the premises, as right and justice may appear to require. The election complained of had been holden on the third Tuesday in October, 1831. The grounds of complaint were, that it had been holden at an illegal time; that legal votes had been rejected; that illegal votes had been admitted; that legal proxies had been refused, and that illegal proxies had been received.

First. It is alleged that the election was holden at an improper time. The charter directs an election to be made of directors on the third Tuesday in October *yearly*, and that the persons elected shall serve as such for the year thence ensuing, " *and until others shall be elected to supply their places.*" These persons had been legally chosen on the third Tuesday in October, 1829 ; but no election took place the following year in October, 1830, and they held *over* in virtue of the foregoing clause until October 1831, at which time they claim to have been re-elected. The applicants charge that the omission to hold an election in October, 1830, was preconcerted by the directors in order to continue themselves in office ; that they frustrated the election by the contrivance of refusing to appoint *inspectors*. The directors say, on the other hand, that inspectors were duly and properly appointed ; but when the day of election arrived, one of them was absent from sickness, and two others of the four did not attend. The board of directors never held a regular session on election day, and they could not convene a special meeting to fill those vacancies, as it required notice to be served on the directors personally, some of whom had left

home and gone abroad on business, not foreseeing the smallest difficulty or emergency. I do not perceive that an investigation of the truth of this charge, or of the merits of the defence, will conduce to a settlement of this application. Let the reasons for not holding an election in October, 1830, be what they may, the omission to hold any is a conceded fact that rendered one at a subsequent time the more necessary, and the main dispute is whether the third Tuesday in October, 1831, was a legal time for holding it. The two statutes are said to disagree about the time of holding an election to supply an omission on the yearly or charter day. The charter, which is the oldest act, 28th January 1812, says it may be done *at any time ;* but the *latter* act 8th of December, 1825, says that if the election shall not be duly holden on the day designated in the act incorporating the company, " it shall be the *duty* of the president and directors to notify an election to be held *within thirty days thereafter."* The applicants insist that the words, " *any time,*" in the charter, which are indefinite in their latitude, were constructively repealed by the latter act of 1825, which directs an election to be notified *within* thirty days thereafter. When two statutes have conflicting regulations on the same subject, the *latter* is insisted by the applicants to be declarative of the law, and is to operate as an implied repeal of the former, according to the maxim *leges posteriores priores contrarias abrogant.* But this is not a primary rule in the construction of statutes; it is a *dernier* resort never to be used while there is a possibility of reconciling the statutes together. Where no repealing words are inserted in the latter act, a strong presumption arises that no repeal was intended or it would have been expressed. A *constructive* repeal is always to be examined with some distrust, especially when it goes to abrogate a charter and destroy rights that were vested under a legal grant. The privilege of holding an election *at any time,* in order to save a dissolution of a corporate body, if divested by implication and construction, must bring on a speedy dissolution. If there can never be a legal election *after* the thirty days are elapsed, the old directors must continue during their lives. When their numbers become so impaired by death or otherwise as not to make a board, their action must cease and the body be defunct. If the power to hold a legal election

M'Neely *v.* Woodruff.

expired at the end of thirty days, the power of the court to or-
der a new election is all gone, and the application itself must
fail.  No constructive repeal ought to be admitted in the face of
these consequences, as long as there is a possibility of reconci-
ling the statutes, and this, I think, may be easily done.  It is
made the *duty* of the directors to notify an election within thir-
ty days.  What is the consequence if they neglect this duty?
The penalty is not to be a forfeiture of the franchise; there is
not such a word in the latter statute.  Such a forfeiture cannot
arise by implication, for forfeitures are odious except when in-
flicted by positive enactment.  The consequence of neglecting
their duty is simply this, that after thirty days the stockholders
may compel them to do their duty by mandamus or otherwise
immediately.  It was not intended to impair the charter right
of holding an election at any time, but to hasten and quicken
the directors in using it, and by putting it in the power of the
stockholders to compel them to do it, if they should neglect for
thirty days.  But all parties saw fit to wait until the next annual
day of election, at which time it took place agreeably to the
charter, and without anything in the act of 1825, to forbid it.
It was not illegal therefore as respected the time.

Second.  The next complaints are, that the inspectors rejected
legal votes and admitted others that were illegal.  There is also
a preliminary complaint that they did not require the transfer
book to be produced as evidence, contrary to the fifth section of
the act of 1825, which enacts that, " in all cases where the right
of voting upon any share or shares of stock, shall be *questioned,*
it shall be the duty of the inspectors of the election to require the
transfer book, as evidence of stock."  The cashier presented a
*list* made out from the books of the company of the names of all
persons entitled to vote, and the number of votes each one
was entitled to give, as he said.  One of the applicants
claimed to vote in right of certain shares, and not finding them
entered on this *list,* he applied to the inspectors to require the
transfer book as evidence.  The reason of not ordering it was,
that the cashier immediately admitted the right claimed, and that
the omission in his list was an accidental mistake.  The correc-
tion of the error put an end to the *question;* and the power of
requiring the book under this section ceased.  It is not to be

exposed and handled to gratify the speculating curiosity of every individual in other men's dealings in stock ; but only where the right of voting is *questioned*, says the section ; and where there is no question, the duty to call for it is not imposed.    Consequently this preliminary complaint is not sustained.

There was some reference made to a provision in the 6th section, where an election has been omitted on the charter day that those who were entitled to vote on that day, and those only, shall be admitted at the next ensuing election.    There was no evidence or pretence of the transfer of any shares between October 1830, and October 1831.    It was therefore impossible that this regulation could be violated, even if it were applicable to an election upon the annual or charter day.

After these preliminaries, the applicants make a definite charge, that the inspectors rejected legal votes upon an erroneous pretence that the shares in right of which those votes were claimed had been forfeited for non payment of instalments, when in fact no forfeitures had legally accrued.    In order to determine this dispute about forfeitures, it is necessary to premise that an original share in the stock of the bank was fifty dollars, which sum each subscriber was bound to pay by instalments as they should be called for, according to law, on pain of forfeiting his share and all previous instalments paid thereon.    Those which had been called for and paid in, up to the 9th of November 1825, had amounted altogether to only thirty dollars.    Then the stockholders were notified to pay a further instalment of fifty cents on each share ; and afterward, on the 12th of February 1828, a further one of twenty-five cents on each share. It was for non-payment of one or both of these small instalments that the shares in question had been declared to be forfeited and were so entered on the minutes of the company.    There was no pretence that the instalments were paid.    It was also admitted, that a forfeiture might be legally incurred under the charter for non-payment of instalments called for, in order to effect the ends and objects of the charter, which were for banking purposes ; but these were called for the declared purpose of defraying incidental expenses ; it was so avowed on the face of the minutes and resolutions of the board of directors ; and the applicants denied that non-payment of instalment, for these purposes, could

M'Neely *v.* Woodruff.

be punished by forfeiture. That forfeitures are so odious to the law that it will never allow them to be enforced beyond the very letter of the grant, nor strain them to answer purposes not plainly expressed. This narrows the matter down to a simple question. Were these expenses for banking purposes? The purposes of a bank are the concentration of capital in the hands of the directors of the company, and the letting of it out in various ways and forms for short periods at the end of which it is to be recovered back with the use or profit. These are some of the incontrovertible purposes of banking, and I deem them quite sufficient without mentioning others. The part which consists in letting out the funds is exceedingly facile, while that of getting them back again, is the most arduous part of the business, and yet it is the only means for effecting banking purposes. Here the whole capital of this bank was standing out some where; one man disclaimed having it, and accused another, and the recovering of these funds was indispensably necessary for banking purposes. nor without it could they be executed. It was essential to the objects of the charter and for banking purposes as a banking house and vaults, officers, a corporation seal, and stationary. Forfeiture for non-payment of the first and second instalments might have been originally resisted just as well, on the like plea that the money was to be applied to building a banking house, and to making compensation to the president, cashier, clerks and tellers for their services, as that it is to be applied now to the collecting and securing of the capital of the bank. If all these are not banking objects and purposes, I am at a loss to know what objects and purposes they are. If an owner retains his share without contributing to these objects, while the other owners are paying up their instalments, he obtains by it quite an undue advantage ; he will have a dividend on all the capital that may be recovered and secured ; yet if nothing be recovered, he will shake the expenses of the effort from his own shoulders, and lay the whole of that burden on his partners. An association could not exist on such an unjust principle, it could result in nothing but distrust and mutual hostility. Whether these efforts to retrieve the capital for banking purposes are wise and hopeful, or rash and desperate, are not to be investigated by the court; all we can decide is, that if in-

stalments are called for and not paid according to the charter the shares on which there is a deliquency are liable to forfeiture, and after that is once established, the right of voting upon them can no longer exist. If permission had been granted to the claimers of such shares to vote for directors when they contributed nothing to the funds, and they had been allowed an equality of privilege with those who contributed all the money it would have produced a vicious election so far as those votes had the power to do it.

The next definite charge, that the inspectors admitted illegal votes, contains a specification of fifty votes being allowed to Mr. Woodruff, in virtue of shares *belonging to the company* and transferred to him as president, *in trust to sell them* for the benefit of the corporation. That these shares were equitably and substantially not his own, but the property of the company, is a fact that can admit of no controversy, and the question arising out of it, is, how and in what form, the company could have voted on them in case they had not been transferred in trust. Belonging to the company they belonged to each and every stockholder in proportion to his interest in the capital of the bank; an interest that could be represented only in fractions. As there are no fractions of a vote, the *real owners* could not possibly exercise the privilege; nor could it devolve on the *directors*, because they are not the *owners* of it; they are no more than *trustees*, like the president himself. The shares are so circumstanced, that the real owners cannot vote, and the necessary consequence is, that they can be voted upon by nobody. This principal is virtually established by the third section of the act of 1825, that if a company purchase or take stock in payment, it shall not vote in virtue thereof, at any election of directors. It is necessarily so at the common law, without the aid or corroboration of this statute. In 5 *Cowen*, 435, *Ex parte Holmes and others*, the point was fully considered and determined, that stock belonging to the whole company cannot be voted upon in choosing directors for that company by any body. This determination is the only one that can rationally be adopted and it shows that these fifty votes were illegally received.

Having considered the right of voting upon stock owned and held by the company, and the bearing of forfeited shares upon

it, the remaining details concerning the improper admission and rejection of proxies do not require to be adjusted in the present case. If the errors alleged therein should be all conceded, they would still leave a majority of legal votes in favor of the defendants. The highest candidate on the applicant's list will remain lower than the lowest on the defendant's list; even after every proxy has been allowed that the applicants claimed, and every one that they challenged, has been subtracted from the defendants. The admission of some illegal votes and rejection of some legal ones, may occur in almost any election, but when these errors shall be all corrected, if a majority of legal votes still appears for those who are returned, it would be wrong and unjust that the majority should not prevail. This is the great leading rule, and by the fourth section of the statute this court is to give such relief " as *right* and *justice* may appear to require." I am therefore of opinion that the election be established, and the application discharged.

CITED in *Downing* v. *Potts,* 3 *Zab.* 84.