## COURT OF APPEALS.

### November 19, 1918.

# THE PEOPLE v. PAUL CHAPMAN.

### (224 N. Y. 463.)

(1.) MURDER—PARTICIPANT IN BURGLARY ANSWERABLE FOR MURDER COMMITTED BY HIS CONFEDERATE.

So long as one remains a confederate, a conspirator, in a design to commit a felony, he is a party to and in law participates in the acts of another done in effecting it. Where, therefore, a party to a conspiracy to commit burglary enters upon the prosecution of such design, which has progressed to some extent, during which murder is committed by another, he is inculpated in that crime.

(2.) SAME—ABANDONMENT OF DESIGN.

Until one who enters with another into an agreement to commit crime abrogates or nullifies to the knowledge of the other, and under such circumstances as would permit the other to take the same action as himself, by words or acts, the conspiracy and confederation between them, there is no abandonment of the joint or common design.

(3.) SAME—TRIAL—CHARGE AND REFUSAL TO CHARGE IN REGARD THERETO.

Upon the trial of an indictment for murder alleged to have occurred while the defendant, with another, was engaged in the commission of a burglary, it was claimed that defendant had desisted from the burglary and left the premises before the killing, and exceptions were taken to a portion of the charge and to refusals to charge in regard thereto. Upon examination of the record, *held*, that the evidence does not support the claim that the defendant had abandoned the commission of the burglary, and that each of the refusals of the trial justice to charge and the parts of the charge challenged were correct.

(4.) SAME—WHEN REFUSAL TO CHARGE VARIOUS DEGREES OF MURDER CONVICT.

The refusal of the court to charge, as requested by the defendant, the various degrees of murder was also right since no possible view of the evidence would have justified any verdict other than a conviction for murder in the first degree or an acquittal.

(5.) SAME—WHEN RECEPTION IN EVIDENCE OF STATEMENT OF DEFENDANT PROPER.

Nor was there error in admitting in evidence a statement of defendant, alleged to have been made to the district attorney upon the advice of a police officer that if he told the truth ''may be there would be some leniency shown him,'' where no threat or no promise was made to him, and there is nothing to connect the district attorney with any proposition to mitigate the proceeding against him or the punishment if a confession were made.

(6.) SAME—DUTY AND POWER OF COURT OF APPEALS IN CAPITAL CASES.

The duty and power of the Court of Appeals in capital cases are neither less nor more rigid or compelling because of the age, character or standing of the convicted defendant. Their extent and their limitation are, that the court know and consider only the facts and evidence which the record discloses and ascertain from them whether or not the defendant has had a fair trial, impartial and free of prejudicial errors and whether or not there was competent evidence from which the jury was justified in finding the defendant guilty of the crime of which he was convicted.

APPEAL from a judgment of the Supreme Court, rendered February 19, 1918, at a Trial Term for the county of Kings, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Matthew W. Wood* and *William R. Murphy,* for appellant. The trial court erred in its charge and refusal to charge as to the legal effect of the abandonment of the criminal enterprise by the defendant prior to the homicide. (Dolan v. People, 64 N. Y. 485; People v. Huter, 184 N. Y. 237; People v. Governale, 193 N. Y. 587; People v. Morse, 196 N. Y. 309; People v. Spohr, 206 N. Y. 521; People v. Patini, 208 N. Y. 180; People v. Marandi 213 N. Y. 606; People v. Young, 88 N. Y. Supp. 1063; Wharton on Homicide [3d ed.], 465, § 435; People v. Knapp, 26 Mich. 112; State v. Allen, 47 Conn. 121.) The so-called confession of the defendant was improperly procured and was improperly admitted in evidence. (Bram v.

United States, 168 U. S. 183; U. S. v. Chapman, 4 Am. L. J. 440; Regina v. Bate, 11 Cox C. C. 686; Regina v. Fennell, L. R. 7 Q. B. D. 147; Regina v. Garner, 1 Den. Cr. Cas. 329; Rex v. Wild, 1 Moody Cr. Cas. 452; Regina v. Moore, 2 Den. Cr. Cas. 523; Regina v. Cheverton, 2 F. & F. 833.)

*Harry E. Lewis, District Attorney (Harry G. Anderson* of counsel), for respondent.     The evidence established beyond a reasonable doubt that the deceased was killed in the commission of a burglary and that the defendant was an active participant in the shooting.     (Doan v. People, 64 N. Y. 485; People v. McElvaine, 125 N. Y. 596; People v. Meyer, 162 N. Y. 357; People v. Sullivan, 173 N. Y. 122; People v. Giro, 197 N. Y. 152; People v. Giusto, 206 N. Y. 67; People v. Johnston, 185 N. Y. 219; People v. Flanigan, 174 N. Y. 356; People v. Place, 157 N. Y. 584; People v. De Martini, 218 N. Y. 561.) Upon the undisputed evidence, the jury were warranted in convicting the defendant of murder in the first degree even though his denial that he actually discharged his pistol be accepted as true.     (People v. Patini, 208 N. Y. 176; People v. Miles, 143 N. Y. 383; Dolan v. People, 64 N. Y. 485, 496; People v. Meyers, 162 N. Y. 357; Conrod v. State, 75 Ohio St. 52; Bissot v. State, 53 Ind. 408; State v. Brown, 7 Ore. 186; Wharton on Homicide [3d ed.], 186; People v. Bliven, 112 N. Y. 79; Commonwealth v. Knapp, 9 Pick. 496; Commonwealth v. Clune, 162 Mass. 206; People v. Repke, 103 Mich. 459; McCarney v. People, 83 N. Y. 413.)     There is no proof that the defendant repented and abandoned the criminal enterprise.     His testimony that he temporarily separated himself from Hughes Davis, without notice to him, after the burglary had been effected, and after the commission in his presence of overt acts of violence upon the deceased Samuel Regensberg by Davis, did not relieve defendant from responsibility for Davis' acts.     Moreover, defendant admits that he afterwards rejoined

the criminal confederacy. Hence the trial court was warranted in refusing to instruct the jury as requested by defendant's counsel. (1 Whart. Cr. Law [11th ed.], 295; State v. McCahill, 72 Iowa 111; State v. Gray, 55 Kan. 135; 1 McClain Crim. Law, § 198; Jones v. State, 14 Ohio C. C. 35; State v. Allen, 47 Conn. 121; Rex v. Edmeads, 3 Car. & P. 390; Wharton on Homicide [3d ed.], 665, 666; State v. Gray, 19 Nev. 212; Sheppard v. State, 172 Ala. 363; State v. Forsha, 190 Mo. 296; Wilson v. United States, 82 S. W. Rep. 924.) The defendant's statement or confession to the district attorney was properly received in evidence. (People v. McMahon, 15 N. Y. 384; People v. White, 176 N. Y. 331; People v. Rogers, 192 N. Y. 331; People v. Trybus, 219 N. Y. 18, 23; People v. Kurtz, 42 Hun 335; Ward v. People, 3 Hill 395, 6 Hill 144; Willett v. People, 27 Hun, 469, 92 N. Y. 29.)

COLLIN, J.:

Under the evidence and the charge of the trial justice the defendant was convicted, under section 1044 of the Penal Law, of killing, while engaged in the commission of a felony, Harry Regensburg. The section provides: " The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed: * * * 2. By an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a * * * design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise."

The verdict of the jury established that Regensburg was shot and killed by the defendant while engaged in the commission of a burglary. Burglary is a felony. (Penal Law, sections 2, 407.) There was evidence which justified the verdict. Thus much is clear and undisputable. The defendant asserts that there was also evidence which would have permitted the jury

to find that the defendant ceased to be engaged in the commission of the burglary before the killing. At the trial the defendant requested the court, in effect, to submit to the jury whether or not, under the evidence, the defendant had, at the time Regensburg was killed, desisted from the burglary, and to charge them that if they found he had so desisted they should render a verdict acquitting him. The court declined to charge the requests, of such effect, of the defendant, who asserts and argues before us, earnestly and cogently through his counsel, that the rulings of the court in that respect were erroneous. Therein the defendant errs.

Our consideration and determination of these assertions do not require that we scrutinize in all its details the evidence concerning the defendant and his acts prior to the night of October 28, 1917, during which the shooting occurred. A general survey of it will fulfill all useful purposes. The shooting occurred in the rear part of the building number 636 Park place in the borough of Brooklyn, New York city. Park place ran east and west and the building was upon the south side. In its front on the ground floor were two shops or stores and a vestibule leading into the hall. It was, in height, of at least three stories. Harry Regensburg was the proprietor of the western store. Behind the stores were the rooms in which the Regensburg family, consisting of the husband, Harry, the wife, Jennie, and their child lived. Three windows opened upon and could be entered from the yard in their rear. In the hall, entered through the vestibule, were the stairs to the second floor and the stairs into the cellar. Stairs led from the cellar into the yard. In the night of October 28, 1917, the family retired about eleven o'clock, the husband and wife sleeping in the bedroom and Samuel Regensburg, a visitor, and the child sleeping on a couch in the dining room. Upon the trial the People proved by a photographer and civil engineer the nature and description of the premises; by police officers, ambulance drivers

and others that Harry Regensburg was, between twelve and one o'clock, twice shot and died from their effects, that Samuel Regensburg was twice shot and died from their effects, and Jennie Regensburg was four times shot and lived, and various other facts. The evidence thus far referred to did not connect in any way the defendant with the shooting or the commission of a burglary. The People then introduced in evidence a statement of the defendant made to the district attorney in the afternoon of October 29 after the arrest of the defendant. The statement asserted: The defendant was born October 19, 1901. He had known Hughes Davis five years. He and Hughes Davis and Hughes' brother, Leo, tried to burglarize 636 Park place. He met Hughes at six o'clock in the afternoon of Sunday, October 28, 1917, at the suggestion or request of himself. He had been with Hughes and some of his friends the night before at Hughes' house. Within the seven days last prior to that time they were several times together. Soon after they met on Sunday they walked, as Hughes desired, by the cigar store of Regensburg to see if there was somebody there. While going there Hughes told him that he tried to rob the place the Sunday night before. They then went to Hughes' house, which Hughes entered to see if his friends had telephoned. Hughes came out and said to him they had not telephoned, that his brother Leo had telephoned he would come from Providence and to wait for him. This was a little after seven o'clock. The brother Leo came and the two brothers went in the house and remained there about ten minutes. The three men then arranged to commit the robbery which had been decided upon by Hughes and his friends at Hughes' house the night before. Hughes and the defendant went to the house of one of the friends to, and did, procure a pistol, additional to the pistol Hughes had, and returned to Hughes' house. The statement proceeds: "His brother had come out looking for him (Hughes). We waited on the stoop and his brother came back and started talking about the job;

talking how they were going to put the chloroform in the room and how to make a get-away and all the signals for the lookout. We went to get the chloroform." Each of Hughes and the defendant had a loaded pistol. The defendant, at the direction of Hughes, sought to buy chloroform at four drugstores, at two was successful and obtained chloroform liniment at a third. He gave his purchases to Hughes, who said: " I guess we have enough now; we will go up to the house " (of Hughes). While going he said: " I didn't tell you where the place is yet; it is Regensburg's." " I asked him if it was not dangerous after trying to do it the Sunday before; that they would be watched; he said no." They went up to Hughes' house and Hughes went in to put the chloroform in the atomizer and rejoined on the street the defendant and Leo. " He had everything with him — he had a jimmy, blackjack, gun, pair of rubber gloves, pair of kid gloves, atomizer and a light — a flashlight, very small one like a shaving tube, only just ¾ as thick. He gave me the rubber gloves and an extra clip of cartridges. He said ' Keep these: I may need them ' * * * I never saw a gun in my life, especialy an automatic. We brought it in the hallway to see how to load it and take it off safely. He saw that it was loaded and I would not kill myself with it." They planned the manner of entering the premises and of signalling. This was some time between eleven and twelve o'clock. They went to the building, and, as planned, Leo went up the side street for the purpose of signalling. Hughes and the defendant went through the vestibule, hall and stairs into the cellar of the building and thence by the stairs from the cellar into the yard. As they were just going to open the window to introduce the chloroform they were disturbed by the opening of a door and the light went through it. " We both ran back and there is a window in the rear of this apartment house and a hole about four feet deep and four feet square. I jumped up on the window and when we got in we were right in the hall of the apart-

ment house. We went outside on the street and walked around and talked. I wanted to throw up the job but he said no. ' Take a chance; there is lots of money there.' I said: ' Are you sure there is lots of money there?' He said: ' Yes.' I said: ' I will try once more, but if we are disturbed again, nothing doing.' We came back again and went in the same way. * * * Had to go in the cellar again. Went down in the cellar and I got out in the same position again. * * * We didn't expect there would be three people there. We expected there would be a man and his wife. I looked in and saw the man and his wife and Hughes looked in and said: ' There is another man there.' I said : ' We can't do anything; I am going to beat it.' He said : ' No, we will take a chance.' I needed the money and I took a chance." Hughes raised the window of the dining room, close to which Samuel Regensburg and the child were sleeping, an inch or so. The window of the bedroom in which the husband and wife were sleeping was open and screened. Hughes " pumped " the chloroform into the dining room. The defendant watched the sleeping persons. Hughes opened the window way up while the defendant watched the people very close to see if they moved. The defendant refused the request of Hughes that he strike Samuel with the blackjack " as there seemed to be a child in the bed." He told Hughes if he didn't want to use the chloroform he would quit as he would not hurt anybody as there seemed to be a child in bed. Hughes took a rag, soaked it with chloroform, put it on the end of the jimmey and set it under Samuel's nose and the defendant went and took another look at the man and woman. Hughes then with the consent of the defendant entered the room through the window, stood for a minute, sat down in the chair next to the bed, held the blackjack or jimmey in his right hand, took the chloroform in the other hand and reached for Samuel's nose, who then woke up and was immediately struck in the head by Hughes with the blackjack or jimmey. The statement proceeds :

." The fellow fell back and screamed and as he screamed I ran out and down in the cellar. I ran around the cellar, but I couldn't find the stairs. I ran back again and I just turned the corner as Hughes was stepping out of the window. He didn't have a hat on. He didn't have the light. I said: ' Let's throw the guns away.' He said: ' No; now is the time you need them.' We ran up the cellar stairs leading to the hall and I just was going to run out the front way but I saw a man run past. I ran to the roof. When we got to the roof I said: ' It's a blind lead.' I expected to run to some other roof. He ran one side and I ran the other. He took the gun and threw it in the corner and I threw mine in the corner. I threw the gloves away. I ripped off both gloves and threw the extra clip away. He says: ' Here's a dumbwaiter.' That's the first thing he said since he came out of the window.  *  *  *  When I was downstairs I heard something that seemed like a man getting hit with the blackjack. Every time I heard this I heard a scream. I was excited. I thought Hughes was hitting this fellow and I heard the man scream. As I heard this I ran. Hughes didn't run with me. I ran down in the cellar and I couldn't find the stairs without a light. I ran upstairs to see how Hughes was making out and he was coming out of the window."

Upon the trial the defendant was a witness in his behalf. His testimony described his age, family history, conduct and occupations, and tended to show that he was fairly well educated, had been crimeless, reputable and reasonably industrious, although of many employments; the meeting October 20, 1917, between himself and Hughes Davis, whom he had not then seen for a year and a half or more, and various interviews with him prior to October. 28, 1917, and their meeting on that day. The various transactions of the Sunday evening, after Leo Davis came and prior to the entering of the building 636 Park place, and the subsequent transactions were substantially testified to '

by him as we have stated them, except that he increased his expressed hesitation in proceeding with the crimes. These differences in the statement and the testimony may be noted. In the statement the defendant said he ran out of the cellar "to see how Hughes was making out." As a witness he testified: "I was running around, and then I thought, all of a sudden, about the flashlight he had, I ran up the stairs again, and I seen him just coming out the window, with one foot out. The only thing I noticed about him was he didn't have any hat on, and I ran over and I said to him — I says: 'What will we do? Throw the gun away now?' because he told me, if anything happened, to throw everything that you have away. He said: 'No,' he says, 'now is the time you need them.' I said: 'Need nothing. I would rather get arrested than shot.' I said: 'Find a light.' He said: 'I couldn't find one.'" As a witness he stated that the first act of Davis, after entering the room through the window, was to place his gun on the table close to the chair in which he sat.

Returning to the evidence of the People. A police officer testified that he, on duty, standing on the north side of Park place diagonally somewhat easterly from 636 Park place, heard five pistol shots at that building and was the first officer to reach it. He found upon the roof of the building the clip or chamber of an automatic revolver. The atomizer and jimmy were found in the yard. The blackjack was found in the pocket of Hughes Davis who was shot and killed by the officers. Kid gloves were upon Hughes' hands. Upon the roof were found, also, two pistols and a pair of rubber gloves, one of which was torn. Druggists testified as to sales of chloroform to the defendant on October 28, 1917.

In behalf of the defendant, teachers testified that he while in school was of good reputation, conduct and proficiency. His mother, as a witness, described the happenings in the family, and the character and conduct of the defendant as good. Two

witnesses for him testified that he sang in church choirs. He was 5 feet, 10 inches tall and weighed 150 pounds. His age, as he testified, was sixteen years on October 19, 1917.

In the briefs and arguments of counsel emphasis and elaboration were applied to the testimony of the expert witnesses. The chief issue between them was whether or not the Infallible pistol, which the defendant had, was fired during the commission of the crimes. The purpose of the People was to prove by the testimony of their expert witnesses that the defendant did not leave the windows or yard, and in fact was in the room with Hughes Davis. Under the evidence, whether he did or did not became clearly a question of fact and as such was determined by the jury. We have not, therefore, deemed it necessary to narrate at length the testimony. We have stated adequately and in substantial effect the evidence which relates to and is the basis of the assertions under discussion, to the direct consideration of which we now turn.

The jury were instructed that the evidence in behalf of the People had been directed entirely towards establishing the crime of shooting Regensburg while in the commission of a burglary, and as follows: " If you are satisfied upon this evidence that this defendant was one of those who planned this entrance into the dwelling house; and are satisfied that there was that burglarious and felonious entry with the intent to steal therein, that he was present when the entry occurred, and that after the entry occurred a murder was committed, a killing was done, in furtherance of the common purpose to commit burglary, the defendant's participation in that burglary renders him amenable to this statute and regards him as guilty of murder in the first degree. And so, gentlemen, in this case, it is either acquittal or guilty as charged." They were also instructed: " If you are satisfied, gentlemen, of all of those things, and that those things went to make up their preparation for the crime of burglary in these premises, and were followed by the

actual act of the entry of one of them, down to which time the defendant was present, that which thereupon happened in those premises in the way of shooting not alone constituted the crime of murder in the first degree, but inculpated the defendant in the commission of that offense." Such instruction was excepted to by the defendant. The defendant's counsel requested the court as follows: " I ask your honor to charge the jury that if the jury believe that this defendant fired no shot, and if the jury believe that this defendant abandoned the premises forming the subject matter of this alleged burglary before any shot was fired by his co-defendant or by his co-conspirator, they must then find that he was not then engaged in any felony or in any attempt to commit a felony."

" I ask your honor to charge that if the jury believe that this defendant fired no shot, and that he abandoned the premises forming the subject matter of this burglary, before Hughes Davis fired a shot, then the burglary was not continued by either this defendant or by his co-conspirators."

" I ask your honor to charge the jury that if they find that the defendant had desisted from the burglary or an attempt to commit burglary, at the time of the killing of Harry Regensburg, he is not guilty of murder in the first degree."

Each of these requests was declined by the trial justice and exception to each ruling was taken by the defendant.

If the defendant had remained in the yard and without the building burglarized while Hughes Davis assaulted the sleeping man and later fired the shots causing the death, he would, beyond question, have inculpated himself in that crime. This conclusion flows from the application of certain established rules of law to the evidence. There was evidence of these effects; the defendant was a party to, a participant, a conspirator, in the design, common to Hughes Davis and the defendant, at least, to commit the burglary; he with Hughes Davis entered upon the prosecution of that design; in such

prosecution the killing was done by Hughes Davis. So long as the defendant remained a participant, a conspirator in that design, he was a party to and in law participated in the acts of Davis done in effecting it. " A person concerned in the commission of a crime, whether he directly commits the act constituting the offense or aids and abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces or procures another to commit a crime, is a ' principal.' " (Penal Law, sec. 2; People v. Bliven, 112 N. Y. 79, 82, 6 N. Y. Crim. 365; Ruloff v. People, 45 N. Y. 213; People v. Giro, 197 N. Y. 152, 24 N. Y. Crim. 255; People v. Giusto, 206 N. Y. 67; People v. Friedman, 205 N. Y. 161, 24 N. Y. Crim. 170.)

A question which next arises naturally is, is there evidence tending to prove that the defendant ceased to be a party to, a confederate, a conspirator, in the design to commit the burglary? Did that design cease, before the killing, to be a confederated, a common design? In State v. Forsha (190 Mo. 296, 331) Forsha was indicted with Bailey and Moon and was convicted of murder in the second degree. The court said: " If the defendant aided, abetted or encouraged Bailey, in the commission of this homicide, as some of the witnesses put it, at the time the difficulty was in progress, commanding Bailey to ' shoot him; shoot him; kill the son-of-a-bitch,' the mere fact that he undertook to flee from the scene of the difficulty before the fatal shot was fired, by no means can relieve him of responsibility for his participation in the commission of the act.

" We are unwilling to sanction as the law of this State, that a defendant can first, by words and actions, put in operation a difficulty or aid and abet in the commencement of it, and after having, by his course of conduct, brought the principal actors into a deadly contest, can then flee from the scene of the struggle and thereby relieve himself absolutely from the results of such fatal difficulty."

In Romero v. State (101 Neb. 650) Romero was convicted of homicide in participating in the killing of Cross seeking to arrest him and two others while robbing a car. His brief stated: " The theory of the defense supported by evidence was that defendant was present unwillingly; that he had no gun; that he was anxious to go home; and that he ran away as long as five minutes before Cross was shot." (p. 651.) He, as a witness in his behalf, testified that after Cross had knocked down one of the three men committing the crime with his revolver the defendant made his escape and ran away; a few minutes after he ran away the watchman was shot and killed by one of the two other burglars. The trial court charged: " In this connection you are instructed that it makes no difference at what stage of the attempted burglary, if you find from the evidence, beyond a reasonable doubt, one was attempted, the shooting took place, as long as such design and attempted burglary had progressed to some extent, in the manner and form charged." (p. 656.) The Supreme Court upheld the conviction and said: " Where one shares with others in the burglarious intent and act, and killing results from it as one of its natural, ordinary, and probable consequences, he will not be heard to say that he did not intend or share in it. In the instant case, the plaintiff by his own testimony knew that his companion had a gun. He was bound to know that his companion might use it in resistance of an officer who might attempt to arrest him. The attempt to arrest is an interference with their plans. It is common experience that persons engaged in committing a felony may kill those who interfere. Such appears to be the general though possibly not the universal, holding of the courts." (p. 652.)

The consent of the defendant to make the burglary " a three man job," his aid and activity in making the preparations for the burglary influenced Davis in undertaking it. His entering with Davis the vestibule, hall, cellar and yard, his returning

with him to the yard after the disturbance and flight, his participation in all the acts prior to the very act of shooting were efficient encouragements and causes for the entrance of Davis to the room, the administering of the chloroform, the slugging with the blackjack and the shooting. We are unable to conceive how the running away of the defendant as the shooting naturally might occur could change the joint, the common design and undertaking into the sole design and undertaking of Davis. If before either of the two entries into the building the defendant had concluded: "I will go no further in this; and if you go on you will have to go without me; I will have nothing more to do with it," and had acted accordingly, he would have repented of and abandoned the design and afforded Davis an opportunity to do likewise. Probably too, if he had so said and done before Davis chloroformed Samuel or raised the window, before the shooting was a natural or probable consequence of their joint acts, the purpose would have ceased to be common; Davis would have proceeded, if he proceeded, singly and not as the confederate of the defendant and the shooting would not have occurred in the commission of a felony by the defendant. But the real situation, as the defendant testified, was wholly different. The defendant helped to so bring together all the conditions and elements that the shooting was imminent, if not inevitable, and asks the courts to declare that he is in no way liable for it in case he tried, without notice to or the knowledge of, his confederate, to run from it as it was happening. Neither reason nor justice consents to the request. The law should and does not. He afforded Davis no opportunity to abandon the further execution of the felony. The connection between him and Davis was to no extent broken. He had done nothing which would have justified Davis in refusing to share with him the avails, if any, of the burglary. Until he abrogated or nullified, to the knowledge of Davis and under such circumstances as would permit Davis to take the same

action as himself, by words or acts, the conspiracy and confederation between them, there was not an abandonment of the joint or common design. (State v. Webb, 216 Mo. 378, 388; State v. Allen, 47 Conn. 121; State v. Hayes, 78 Mo. 307, 317; Wilson v. United States, 82 S. W. 924; State v. Forsha, 190 Mo. 296; Romero v. State, 101 Neb. 650.) Moreover, the evidence affirmatively shows that the defendant did not intend to abandon the commission of the burglary. Apart from his mental operations, we have in his testimony the facts that he, without notice to or the knowledge of Davis, who, with his pistol almost in his hand, had then struck in the head the awakened Samuel Regensburg with the blackjack or jimmy, ran into the cellar, stayed there looking for the stairs, which he did not find, for a brief space of time which he does not know was a minute, then returned to the yard and to Davis, to whom he said either, " Let's throw the guns away," or, " What will we do ?  Throw the gun away now ? " and henceforth acted wholly in conjunction with him.  If we take into consideration his mental operations he returned to Davis either " to see how Hughes was making out," or because he " thought, all of a sudden, about the flashlight he had."  There was not any evidence tending to support a finding that the defendant abandoned the commission of the burglary, and each of the refusals of the trial justice to charge and the parts of the charge challenged were correct.

The refusal of the court to charge, as requested by the defendant, the various degrees of murder was right.  There was no possible view of the evidence which would have justified any verdict other than a conviction for murder in the first degree or an acquittal.  The killing was while a burglary was being committed or in an attempt to commit a burglary.  In case the defendant was at the time of the killing engaged in the commission or in the attempt the verdict could have been for the conviction found alone; in case he was not so engaged the

verdict could have been for an acquittal alone. Under those conditions the refusal was not erroneous. (People v. Schleiman, 197 N. Y. 383, 24 N. Y. Crim. 233.)

The admission in evidence of the statement of the defendant made to the district attorney was not an error. The statute provides: "A confession of a defendant, whether in the course of judicial proceedings or to a private person, can be given in evidence against him, unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney, that he shall not be prosecuted therefor; *   *   *" (Code of Criminal Procedure, section 395.) The defendant asserts that it was error to receive the statement because of these facts: He, at the trial, as a witness for himself, testified that about half-past eight in the forenoon of the day of his arrest, a police officer stated to him, in the Regensburg apartment, that Hughes Davis had made a statement implicating him in the crime, and that the best thing for him to do was to tell the truth, and may be there would be some leniency shown him. His counsel then proceeded: "Q. Did he say leniency — where, or by whom or when? Ans. I asked what that lenciency would be. He said, 'You will have to see the district attorney about that.' I said, 'Well, come on and we will go down to see the district attorney then,' and he said, 'No, tell me first. We will go down there afterwards.' He said, 'I want to get this thing cleared up;'" the defendant then made a statement to the police officer. Davis had not made a statement. At about four o'clock in the afternoon of that day he made the statement to the district attorney which was received in evidence. The statement begins: Q. "What is your name? A. Paul Chapman. Q. You are going to be charged with crime and anything you say may be used against you; you understand that? A. Yes. Q. With knowledge of that fact you are willing to make a statement and tell all you know? A. Yes." The defendant, at the trial, as a witness for

himself, testified that when he made the statement to the district attorney he had in mind that the police officer had said to him that the best thing for him to do was to tell the truth and may be there would be some leniency shown him, and relied and acted on it. It is manifest from his own testimony that the statement to him of the police officer that Davis had implicated him in the crime did not induce or influence him to make the statement to the district attorney. He did not speak because of a fear that silence would create an inference of guilt or other harm. He spoke through his hope that speaking would be advantageous to him, a hope which did not arise from any word or act of the district attorney, who told him he was going to be — not that he had been — charged with crime and that anything he said might be used against him. He made no request of the district attorney, and did not inform him of the statement of the police officer. No threat or no promise was made to him and there is nothing to connect the district attorney with any proposition to mitigate the proceeding against him or the punishment if a confession were made. The fact that an accused person may conclude it will be advantageous to him to confess rather than keep silence is immaterial, if conditions or circumstances are not created which tend to make silence some evidence of guilt and if his mental operations are free from and uninfluenced by any external inducement to falsify or invent. (People v. White, 176 N. Y. 331, 349, 17 N. Y. Crim. 138; People v. Rogers, 192 N. Y. 331, 346, 22 N. Y. Crim. 376; Balbo v. People, 80 N. Y. 484, 499; People v. Chapleau, 121 N. Y. 266, 273.)

The counsel for the defendant by their brief and arguments zealously and properly pressed upon us their conclusion that the youth of the defendant and his unimpeached conduct and reputation, prior to the commission of the crimes, demand at the hands of the law and its courts and officers scrupulous and exact fairness and legality; that in view of the conditions and

circumstances under which the crime was committed every reasonable interpretation of the law, beneficial to him, should be made. Our duty and our power, in capital cases, are clearly defined and established. They are not changed, they are neither less nor more rigid or compelling because of the age, character or standing of the convicted defendant. We would be recreant to them if we did not, in every case and as to every defendant, act to their full extent and within their limitation. Their extent and their limitation are, that we know and consider only the facts and evidence which the record presented to us discloses, that we examine thoroughly and unflinching the evidence and the record to ascertain from them whether or not the defendant has had a trial fair, impartial and free of prejudicial errors, and whether or not there was competent evidence from which the jury were justified in finding the defendant guilty of the crime of which he has been convicted. If we resolve those questions against the defendant the judgment of conviction must be affirmed.

The trial in the case at bar was conducted throughout with the utmost fairness. The trial justice was considerate and just in all respects toward the defendant and his counsel and protectingly watchful of the defendant's rights. We have been unable to discern any instance in which his counsel failed, either in the preparation for or during the trial to secure to him an adequate, just and impartial trial. The evidence sustained and justified the jury in a finding that he participated in the planning of the burglary and a robbery and participated in the execution of the burglary. The record does not disclose any error prejudicial to him. It may be that he did not contemplate or intend the possible and actual results and consequences of his acts, and that facts and conditions existed which mitigated their criminality. With reasoning or facts of such a character, we have no concern. They may well be presented at the tribunal vested with the duty and the power to determine

whether clemency to the convicted offender should, in justice and wisdom, be extended or withheld.

The judgment of conviction should be affirmed.

HISCOCK, Ch. J., CUDDEBACK, CARDOZO, POUND, CRANE and ANDREWS, JJ., concur.

Judgment of conviction affirmed.