STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. MICHAEL MULE, ALIAS MICHAEL MORRELL, GEORGE DeSTEFANO AND CONNIE SCARPONI, PLAINTIFFS IN ERROR.

Argued October 5, 1934—Decided January 10, 1935.

For the plaintiffs in error, *William Reich* and *William J. Connor.*

For the state, *Erwin E. Marshall,* prosecutor of the pleas, and *Leo J. Rogers,* assistant prosecutor.

The opinion of the court was delivered by

HEHER, J.  Plaintiffs in error, Mule, DeStefano and Scarponi, were convicted of murder in the first degree, and sen-

tenced to death. They sued out a writ of error, and the entire record of the proceedings had upon the trial was, under section 136 of the Criminal Procedure act (2 *Comp. Stat., p.* 1863), returned with the bill of exceptions.

The decisive question, raised by a specification of causes for reversal, is whether there was misdirection in the instruction that each of the plaintiffs in error, if guilty of any offense under the indictment, is guilty of murder in the first degree. The victim of the homicide, John Szczytkowski, was the possessor of money which plaintiffs in error admittedly coveted, and the insistence of the state is that the homicide charged was "committed in perpetrating or attempting to perpetrate" the robbery of Szczytkowski, and that, consequently, it was murder in the first degree under sections 106 and 107 of the Crimes act. 2 *Comp. Stat., pp.* 1779, 1780; *Pamph. L.* 1917, *p.* 801.

Disposition of the question thus raised entails consideration of the evidence. The essential facts follow: Concededly, plaintiffs in error were moved, in the series of acts which eventuated in the homicide, by a common design to rob Szczytkowski. DeStefano conceived the evil scheme. On the afternoon of October 30th, 1933, he learned that Szczytkowski had on his person $500 in currency, withdrawn that day from his bank deposit for the purpose of making the final payment due under a contract for the construction of a dwelling house. He promptly sought out Mulé, and imparted the information to him. They determined to take the money by force, and, within the hour, unfolded the plan to Scarponi, whose assistance was procured because DeStefano was known to the decedent, and Mule would not conduct the actual holdup alone. In an automobile owned and driven by DeStefano, they went directly to Szczytkowski's home on Indiana avenue, in the city of Trenton, DeStefano pointed out decedent's house to his confederates, and then brought his car to·a stop at a point two blocks therefrom. With his knowledge, Mule and Scarponi each took a loaded revolver from the automobile, and proceeded to their destination. The two last-named testified that there was an express under-

standing that DeStefano would await them there, and render assistance in effecting their escape after the perpetration of the robbery, and that upon their return, after an abortive attempt which resulted in the fatal shooting, they found that DeStefano had departed. The latter denied that such was the understanding, but acknowledged, as did his confederates in the crime, that they were to divide the proceeds of the robbery. DeStefano also admitted that, later that night, he communicated with Mule by telephone, and inquired: "how did they make out," and received the reply "all right;" and that shortly thereafter he met and conferred with him at an appointed place, unquestionably for the purpose of learning what had occurred, and of sharing in the proceeds of the criminal enterprise, and of planning for such action as might be deemed advisable to avoid the legal consequences of their crime. DeStefano said that the meeting did not take place until the next day, but Mule testified that they met that night, and that when he asked DeStefano why he "didn't wait," the latter replied: "I heard a shot and that is the reason I left." The revolvers were the property of Scarponi. They were in Mule's possession—Scarponi, so it is said, had turned them over to him for the purpose of exchanging them for a shot gun—and were placed in the automobile by Mule after he and DeStefano had planned the robbery, but before journeying to Scarponi's home to enlist his aid.

There is little or no substantial dispute in the testimony given by Mule and Scarponi as regards the fatal altercation with Szczytkowski. They arrived at the house between seven and seven-thirty o'clock on the evening in question. They ascended the steps leading to a porch that reached across the entire front of the house. The customary railing extended along the porch from the steps. Mule knocked on the door. Scarponi stood on the porch to his left, at a point where he could not be observed by those who came to the door. Scarponi thus concealed his presence, fearing that otherwise the deceased would not step to the porch, where they planned to conduct the holdup. Decedent opened the door. Behind him were his wife and daughter, the latter

eleven years of age. After a brief conversation, in which Mule pretended to be looking for a whiskey vendor living in the neighborhood, he issued the command, "stick them up; this is a holdup," or "this is a stickup." Mule acknowledged that when this command was given, he had gun in hand, concealed in his coat pocket, and that, by word and action, he made it evident to Szczytkowski that he was possessed of the weapon, and determined to make use of it, if necessary, to enforce his commands and accomplish his criminal purpose. Decedent resisted. Mule and Scarponi testified that he struck the former and "shoved" him from the porch. Mule insisted that, at this point, he indicated to the deceased a purpose to abandon the plan to rob. He testified: "He [decedent] hit me. He knocked me against the banister and grabbed hold of me and he was going to hit me again, and I said to the man, 'don't; I quit,' and he shoved me off the porch, and then he turned around and saw Connie [Scarponi], and it seemed to me like he had his hand to his back when he went for Connie, and I said—when I was knocked off the porch I was down on my knees, and he went toward Connie with his hand at his back, and I said to the man, 'look out; we quit.' First I said, 'Look out, Connie.' Then I said to the man, 'leave him alone; we quit.' And he struck Connie, and *while he was walking back* suddenly I heard a shot." At this point Mule, so he said, was on his knees near the foot of the steps. Only one shot was fired. Scarponi thereupon "jumped off the porch," and he and Mule ran to the point where they left DeStefano and the automobile. On cross-examination, Mule reiterated that, when he observed decedent "with his hand at his back," he shouted the warning, "look out, Connie;" that decedent struck Scarponi, and immediately thereafter the shot was fired.

This was Scarponi's narrative of the occurrence: "And then somebody pushed Mike [Mule] and Mike hit the banister of the porch, and then the man hit Mike in the jaw again and knocked him off the porch, and Mike was on his knees, and Mike says, 'stop; we are through.' And the man backs up and he comes toward me, and Mike says, 'look out.' I

tried to get away from the man but the man hits me in the jaw and knocks me dizzy. *Q.* Then what happened? *A. Then I shot to scare the man. I didn't shoot to hit him. Q.* What caused you to shoot? *A. Because the man was putting his hand in his back pocket and I thought he was going to shoot me and I got scared. Q.* What did you do after you shot? *A.* I jumped off the porch and Mike was following me. We were running toward the car but the car was not there * * *." Scarponi, too, had his gun concealed in his pocket, and was prepared to "aid Mule in case it was necessary." There was a signficant silence after the following question was put on cross-examination: "And if it was necessary to shoot or to take life in order to get that $500 it would have been done, would it not?" It remained unanswered. When asked how long he had been on the porch before the shot was fired, he replied: *"Oh, it happened in a second; * * * it happened suddenly."* While insisting that he "was trying to get away from" decedent, he admitted he made no effort to retire from the scene before the shot was fired. To the question why he did not "go over the porch," he replied: "I was all excited." He finally agreed that he *"did not attempt to * * * get away from"* decedent—that he *"did not try to get away."* And he gave this revealing testimony: *"Q.* And wasn't that part of the plot before you went there, that you would keep out of sight so that if it was necessary to do bodily harm to this man, in order to rob him it would be done, and that is the reason you kept out of sight? *A.* Yes."

DeStefano insisted that he urged his co-conspirators, as they left his car, with the revolvers concealed on their respective persons, not to "hurt the fellow."

Each plaintiff in error complains, first, of the specific instruction that, if he were found guilty, the "verdict as to him must be guilty of murder in the first degree." The asserted vice of this instruction is that, under the evidence, the jury would have been justified in finding that "the defendants did not attempt to rob the deceased."

This criticism is without substance. That there was a common design to rob is unquestioned. As to the circum-

stances attending the firing of the fatal shot, the trial judge instructed the jury that, to sustain the indictment, it was incumbent upon the state to prove, by evidence beyond a reasonable doubt, that the "defendants were either perpetrating a robbery or attempting to perpetrate a robbery when the deceased was mortally wounded by one of them;" and that, to justify conviction of murder in the first degree, the evidence must be of such quality as to satisfy the jury beyond a reasonable doubt (1) that the plaintiffs in error conspired to rob the deceased; and (2) that, *while an attempt to rob the deceased was being made,* in furtherance of the conspiracy, Scarponi fired the shot that resulted in decedent's death. Thus far the jury were clearly advised that the killing, to be murder in the first degree, must have been committed in perpetrating or attempting to perpetrate the planned robbery. In the further instruction that the alternative was acquittal, there was, as to Scarponi, a favorable and not a prejudicial narrowing of the issue; for, if it were found that the killing did not occur in the perpetration or attempted perpetration of a robbery, it was nevertheless a question for the jury, under the evidence adduced, whether or no there had been a willful, deliberate and premeditated killing by Scarponi, constituting murder in the first degree under the same statute.

But it is insisted that the charge, on this crucial phase of the case, was unduly qualified by the instruction that Mule is, under such circumstances, guilty of murder in the first degree, "even if it be true that, after the deceased had struck him or while the deceased was grappling with him, he, the defendant Mule, alias Morrell, said to the deceased, 'leave me alone, we quit,' or 'stop, we're through,' or otherwise indicated an intention to desist from further efforts to rob the deceased;" and by the further instruction that Scarponi is likewise guilty of murder in the first degree, "even if it be true that the defendant Scarponi fired the revolver because he believed that the deceased was about to draw a revolver on him, or he fired the said revolver with the sole intention of scaring the deceased and not with the intention of killing of wounding the deceased, or that, shortly before firing the

said revolver he said to the deceased, 'stop, we're through' or 'don't, we have enough,' or otherwise indicated an intention to desist from further efforts to rob the deceased."

"The error affirmed of these passages is that, under the evidence, 'it became a question of fact for the jury to decide as to whether what the defendants, Scarponi and Mule, said and did constituted an abandonment of an attempt on their part to rob the deceased.'"

This claim is likewise untenable. The evidence presented no rational basis for a finding by the jury that either Mule or Scarponi had, before the firing of the fatal shot, abandoned their acknowledged attempt to rob the deceased. There must be a timely and effectual abandonment of the criminal design. Such was patently not the case here. There was not an unequivocal withdrawal by either plaintiff in error from the attempt to perpetrate the crime in question, indicated by appropriate action. Concededly, no attempt at escape was made until after the shot was fired. Neither plaintiff in error made an effort to depart from the scene until after the mortal wound was inflicted, and then they fled together, with Scarponi leading the way. The latter testified that "bodily harm" to decedent was to be resorted to, if necessary to perpetrate the robbery. This was not denied by Mule, the other active participant in the attempted robbery, although DeStefano testified that he urged his co-conspirators not to injure decedent. But this, for the reasons to be stated, is of no avail to him. Moreover, Scarponi admitted that he was armed, and prepared to render aid to Mule "in case it was necessary." And this would be an undeniable inference without such an admission. He insisted the shot was fired merely "to scare" decedent, "because the man was putting his hand in his back pocket and I thought he was going to shoot me and I got scared." But even if this were so, it was nevertheless an act committed in the attempted perpetration of the robbery. Decedent was justified, in the circumstances, in resorting to every possible measure for self-protection, even to the use of a deadly weapon. *State* v. *Bonofiglio*, 67 *N. J. L.* 239. That the resistance offered by the intended victim, whether unexpected or otherwise, prompted Scarponi to use

the gun for self-protection, is therefore of no moment. It matters not that he fired the shot to escape violence at the hands of the resisting victim, and not to aid in the consummation of the planned robbery, or because of fright, as he suggested.

In such circumstances, the shooting was woven into the fabric of the planned crime, and was inseparable from it. Flight had not commenced. It did not begin until after the death-dealing bullet had been fired into decedent's body. The criminal purpose to perpetrate a robbery was, to all intents and purposes, in process of execution when the shot was fired. The attempt to commit the crime had not been abandoned. The mere declaration, not followed by unequivocal action suited to the word, of an intention and purpose to desist from further acts in the effectuation of the object of the conspiracy was manifestly insufficient. The shooting was then imminent, if not inevitable. The uncontradicted testimony of Scarponi was that there was but a brief interval of time between the command given to decedent, at the point of a gun, and the shooting. In that situation, the shooting was indubitably a part of the *res gestæ* of the plotted crime. It was so closely connected with the execution of the criminal purpose as to require that classification. The homicide was not an independent act dissociated from the attempted robbery. It was unquestionably an act immediately connected with the attempted perpetration of the underlying crime. *State* v. *Turco,* 99 *N. J. L.* 96; *State* v. *Rombolo,* 91 *Id.* 560; *Hunter* v. *State,* 40 *Id.* 495; *Conrad* v. *State,* 75 *Ohio St.* 52; 78 *N. E. Rep.* 957; 6 *L. R. A.* (*N. S.*) 1154; *Bissot* v. *State,* 53 *Ind.* 408.

Under the circumstances, the killing was one of the natural, ordinary and probable consequences of the attempt to perpetrate the robbery, and, at the time when Mule said he announced his intention to desist from further prosecution of the undertaking, it was manifestly too late to stay the hand of Scarponi. Reason and justice, predicated of the statute classifying as murder in the first degree a killing committed in the perpetration of a robbery, dictate that there must be a definitive withdrawal from the common

felonious design before the killing became a natural and probable consequence of the joint action. To absolve the one asserting withdrawal, opportunity must be given to the co-conspirator directly responsible for the death to abandon the further execution of the felonious design. *People* v. *Chapman,* 224 *N. Y.* 463; 121 *N. E. Rep.* 381; *State* v. *Forsha,* 190 *Mo.* 296; 88 *S. W. Rep.* 746; 4 *L. R. A.* (*N. S.*) 576; *Romero* v. *State,* 101 *Neb.* 650; 164 *N. W. Rep.* 554; *L. R. A.* 1918 B 70.

If one detected in the perpetration of a crime employs a deadly weapon to aid in escaping apprehension and the legal consequences of the crime, as in the commission of a burglary, or if one pursuing crime does likewise when the intended victime resists, as in the attempted perpetration of a robbery, it is an act inseparable from the plotted crime. It is immediately identified with its attempted perpetration. Such is patently the statutory concept of the term "perpetration." While such statutes are, under a well-established principle, to be strictly construed, a construction that would limit its applicaion to the events occurring before the underlying crime is technically completed, would do violence to the clear reason and spirit of the law. It was manifestly not the legislative purpose to exclude from the category of first degree murder a homicide committed while the intended victim was engaged, as here, in repulsing his armed assailant.

The apposite principle was declared and applied by the Court of Appeals of the State of New York, in *People* v. *Giro,* 197 *N. Y.* 152; 90 *N. E. Rep.* 432. There two men, armed with revolvers, were discovered, by one of the occupants, in the act of burglarizing a dwelling house. They attempted escape. On their way out, they were intercepted by other members of the family, and in the altercation, and apparently to aid in the escape, they discharged their revolvers. A member of the family was killed by one of the bullets so fired. Judge Vann held: "All that they did was in furtherance of their original design to rob the house, and what they did to save themselves and escape was as much a part thereof as breaking in with the jimmy or stealing the pocketbook. When they armed themselves to enter upon a

felonious undertaking, shooting was the natural and probable result in order to get away if discovered; and, if either fired the fatal shot, both are responsible. From the beginning to the end they were engaged in a common crime, and the homicide was within the common purpose. Both were principals throughout, and what one did both did in the eyes of the law. A shot fired by either under the circumstances disclosed by the evidence was the act of both, whether their minds met in the act of shooting or not, providing they met in the act of committing the burglary. That fundamental fact carried with it the heavy responsibility which the law places upon all who are acting together in the commission of a felony, when one of their number kills an outsider, even by shooting to frighten and not to take life." And in *People* v. *Nichols,* 230 *N. Y.* 221; 129 *N. E. Rep.* 883, where the trial judge refused to submit to the jury the question of the abandonment of the criminal enterprise before the firing of the fatal shot, Chief Judge Hiscock said: "Whatever may be the other requirements of an effective abandonment of the criminal enterprise, it is certain both as a matter of law and of common sense that there must be some appreciable interval between the alleged abandonment and the act from responsibility for which escape is sought. It must be possible for a jury to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. The process of detachment must be such as to show, not only a determination upon the part of the accused to go no farther, but also such as to give his co-conspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act in question is committed. A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because, as the result either of fear or even of a better motive, he concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced, as in this case.

While it may make no difference whether mere fear or actual repentance is the moving cause, one or the other must lead to an actual and effective retirement before the act in question has become so imminent that its avoidance is practically out of the question. Defendant's alleged abandonment, under the most favorable aspect of the evidence, would not permit a jury to say that he had effected any such retirement from the criminal plan to which he was a party before the shot was fired which killed Wolchock."

In *Romero* v. *State, supra,* the ruling principle was applied: "Where one shares with others in the burglarious intent and act, and killing results from it as one of its natural, ordinary, and probable consequences, he will not be heard to say that he did not intend or share in it. In the instant case the plaintiff, by his own testimony, knew that his companion had a gun. He was bound to know that his companion might use it in resistance of an officer who might attempt to arrest him. The attempt to arrest is an interference with their plans. It is common experience that persons engaged *in committing a felony may kill those who interfere."*

To the extent that the jury were instructed that the named plaintiffs in error were guilty of murder in the first degree, even though they "otherwise indicated an intention to desist from further efforts to rob the deceased," the charge is erroneous. This instruction is unspecific. It connotes the expression of the intention by unambiguous conduct, such as fleeing. It may well be that such an intention would, in a given case, be "indicated" by more than a mere announcement, *i. e.,* by taking flight, or otherwise unequivocally signifying actual desistance. In such event, the charge would be incongruous and contradictory, in the sense that one who had unmistakably indicated desistance from efforts to perpetrate a crime could not be said to be engaged in an attempt to commit it. The doctrine of *ejusdem generis* is not, for obvious reasons, applicable. But while technically deficient, this instruction did not prejudice either of the plaintiffs in error, for the reason that there was no evidence tending to show actual desistance. Neither plaintiff in error, therefore, suffered manifest wrong or injury justifying reversal.

And the testimony of DeStefano, that there was no understanding that he was to await the return of his co-conspirators, and that he completely withdrew from the scene before the plan to rob was put into execution, did not call for the submission of his case to the jury. Where several persons enter into a conspiracy for the common object of committing robbery, and, in the attainment of that end, one of the conspirators does an act which causes the death of a third person, all are principals. *State* v. *Turco, supra.* The asserted withdrawal by DeStefano, as in the case of Mule, was not communicated by him to his co-conspirator, Scarponi, in time to afford the last-named an opportunity to consider and act upon his alleged abandonment of the criminal enterprise. Moreover, the jury were instructed that one of the requisites of guilt in his case was his presence, while the attempt to rob was being made, "near the home of the deceased or elsewhere, waiting, for the purpose of aiding the other defendants later to escape or dividing the expected booty upon later meeting them." Thus the standard of conduct laid down by the trial judge was, to a substantial degree, unduly favorable to this defendant. In *State* v. *Forsha, supra,* the Supreme Court of Missouri, in applying the applicable principle, said: "We are unwilling to sanction as the law of this state that a defendant can first, by words and actions, put in operation a difficulty, or aid and abet in the commencement of it, and, after having by his course of conduct brought the principal actors into a deadly contest, that he can then flee from the scene of the struggle and thereby relieve himself absolutely from the results of such fatal difficulty."

There was, therefore, no evidence tending to show that either plaintiff in error, at the time of the firing of the fatal shot, had abandoned the further execution of the unlawful undertaking, and, in such circumstances, the charge, in the particulars mentioned, was entirely devoid of prejudicial error.

Lastly, it is insisted that there was error in the trial judge's refusal to charge a request embodying the proposition that, if the jury found from the evidence that "the defendants had abandoned their attempt to rob the deceased before the shot

was fired," there could not be a finding "that the deceased was killed while the defendants attempted to rob him." This was substantially charged. Moreover, as stated, there was no evidence tending to establish the abandonment of the criminal enterprise before the firing of the deadly shot.

Judgment affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.

*For reversal*—None.