573 A.2d 1359

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DANIEL MARTIN, DEFENDANT-APPELLANT.

Argued February 16, 1988—Reargued February 26, 1990.

Decided May 17, 1990.

4

*Joel C. Seltzer,* Designated Counsel, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Daniel L. Martin* submitted a supplemental brief *pro se.*

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

Defendant, Daniel Martin, was found guilty of knowing and purposeful murder, felony murder, arson, and aggravated arson arising out of the death of a woman in a building that he set on fire. At sentencing, the felony-murder verdict was merged into the conviction for knowing and purposeful murder, and the arson verdict into the aggravated-arson conviction. On the knowing- and purposeful-murder verdict, the jury found that the death penalty was not appropriate, and defendant was sentenced to life imprisonment with thirty years of parole ineligibility. Defendant was sentenced to a concurrent ten-year term with five years of parole ineligibility on the aggravated-arson conviction.

The Appellate Division affirmed, 213 *N.J.Super.* 426, 517 *A.*2d 513 (1986). We granted defendant's petition for certification seeking reversal of the murder conviction, 108 *N.J.* 654, 532 *A.*2d 234 (1987). Because the charge incorrectly instructed the jury on the standard for finding that defendant's act caused the death of the victim, we reverse defendant's murder conviction.

I

On June 29, 1983, defendant and four others from Keyport attended a party in the apartment of Lois Baker on the third floor of a three-story wood-framed building in Keansburg. Defendant, who claimed he was intoxicated, stated that he had smoked marijuana and consumed four beers before the party, and four more beers and four shots of Southern Comfort at the party. Paul Wade, one member of the Keyport group, became involved in two altercations with other guests, including Mike Kilpatrick. After the second altercation, Baker told everyone from Keyport to leave. On leaving, defendant and Wade vandalized a motorcycle that they thought belonged to Kilpatrick and removed the rear-view mirrors, which defendant placed outside Baker's apartment.

Within fifteen minutes after defendant left Baker's apartment, another guest noticed that the building was on fire. Everyone escaped, except Barbara Quartz, who had fallen asleep after drinking alcoholic beverages at the party. She died of asphyxiation due to smoke inhalation and carbon monoxide intoxication.

According to defendant, he set the fire by lighting a paper bag containing trash that he found in the hallway by Lois Baker's door. Defendant testified:

> I picked up the bag and walked down the steps with it. I was just, you know, throwing it around making a mess, you know, and I set it down and I lit up a cigarette. And the match—I lit the paper bag on fire, you know, 'cause I thought maybe it would burn up the garbage, you know, not to spread or anything, just make, like make a mess of the bottom of the landing. And then, then I left.

>  *     *     *     *     *     *     *     *

> I put the match on the bag and lit the bag, the top of the bag on fire. I thought it would make a mess of things. I didn't understand. I mean I didn't figure that it would, you know, cause a fire and spread or catch on anything. I thought it would just, you know, burn the garbage and go right out. I didn't mean to hurt nobody.

The State's version of the setting of the fire differed materially from that of defendant. According to the State's experts,

Frederick Dispensiere of the Monmouth County Prosecutor's Office, and Daniel Slowick, a fire insurance investigator, the fire was set by spreading kerosene between the ground floor and the second floor. Dispensiere concluded that the fire was deliberately set through the use of an "accelerant" at some point between those floors. He based his opinion on "[t]he degree of damage in the hallway, the absence of anything in that hallway combustible which could have created that much of a volume of fire, the depth of char, the rate at which the fire spread and the direction that it spread also." Dispensiere found "pour patterns" on the stairway between the first- and second-floor landings, which led him to suspect that an accelerant had been used in the fire. Gas chromatography tests performed on wood samples taken from this area of the building revealed the presence of kerosene. Baker kept kerosene in a plastic milk container outside the apartment, and seven days after the fire Dispensiere found a melted plastic container in the third-floor hallway. Slowick also concluded that the fire had been deliberately set through the use of kerosene. He found "pour patterns" at the top of the first-floor stairway. A lab analysis of wood samples that he took from this area revealed the presence of kerosene.

## II

Initially we address the sufficiency of the evidence to submit to the jury the issue whether defendant knowingly or purposely killed the victim. At the end of both the State's case and of the entire case, defendant moved for a judgment of acquittal on that issue. The trial court denied both motions, and the Appellate Division affirmed, 213 *N.J.Super.* at 435, 517 *A.*2d 513. We agree.

As defined in *N.J.S.A.* 2C:11–3a,

criminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death * * *.

### Purposeful conduct is defined:

A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. "With purpose," "designed," "with design" or equivalent terms have the same meaning. [*N.J.S.A.* 2C:2-2b(1).]

### Knowing conduct is defined:

A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning. [*N.J.S.A.* 2C:2-2b(2).]

In assessing the sufficiency of the evidence, the relevant inquiry is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Brown*, 80 *N.J.* 587, 592, 404 *A.*2d 1111 (1979) (quoting *Jackson v. Virginia*, 443 *U.S.* 307, 319, 99 *S.Ct.* 2781, 2789, 61 *L.Ed.*2d 560, 573 (1979)). On its case, the State introduced into evidence defendant's videotaped confession in which he made conflicting statements and ultimately admitted setting fire to the staircase carpeting. Additionally, the State adduced testimony describing the circumstances surrounding defendant's acts and the expert testimony of Dispensiere and Slowick that the fire was deliberately set with an accelerant. That evidence was sufficient for a jury reasonably to infer that defendant was practically certain that his conduct would cause serious bodily harm or death, or that his conscious objective in setting the fire was to cause serious bodily harm or death.

We likewise find that the evidence was sufficient to justify submission of the matter to the jury at the close of the entire case. In his own defense, defendant testified that he saw "little flames" on the bag but did not endeavor to put out the fire because he thought it would self-extinguish. He testified

that he started the fire with a single match, that he merely intended to "make a mess of things," and that he did not intend to harm or kill anyone. Finally, defendant said that he did not know about the container of kerosene that Baker had placed in the hallway, and contended that there was no direct evidence that he knew the container even existed. Consequently, he contends that a reasonable jury could not conclude that he poured kerosene somewhere between the ground and second floor to accelerate the fire. We disagree.

Giving the State the benefit of all its favorable testimony, a reasonable jury could infer from the evidence that the defendant deliberately set the fire with the aid of kerosene. Given that inference and defendant's knowledge of the attendant circumstances, *i.e.*, the wooden structure of the building, the number of people in the apartment, the fact that they, including Quartz, had been drinking, the evidence could support a finding under *N.J.S.A.* 2C:2–2b(1) and (2) that defendant knowingly or purposely caused death or serious bodily injury resulting in death. *See State v. Reyes*, 50 *N.J.* 454, 459, 236 *A.2d* 385 (1967).

### III

We likewise find that the evidence was sufficient for the jury to conclude that the death of Quartz was causally connected to defendant's conduct. Our conclusion follows from our analysis of the definition of causation in *N.J.S.A.* 2C:2–3 and of the sufficiency of the evidence adduced to establish causation.

Defendant contends that even if a jury could conclude that he acted purposely or knowingly, supervening causes broke the chain of causation so that his conduct was not the cause of the death of the victim. Specifically, defendant argues that the death of Quartz was not a foreseeable, intended, or probable consequence of his conduct, but was caused by several intervening events or conditions. He points to the astroturf carpeting, which, according to his expert, Ralph Snavely, facilitated the

spread of the fire because of its petroleum rubber base. He also asserts that both the door to Baker's apartment and the building's front door were open, which allowed a rush of air to stoke the fire; that the kerosene, which accelerated the fire, was hidden on the third floor and known only to Ms. Baker, but not to him; and that the inoperability of the fire detectors and the absence of fire doors helped spread the fire. Finally, he contends Quartz, who registered a brain alcohol content of .137, contributed to her own death through her intoxication. Reasoning from these facts, defendant concludes that the death of Quartz was too remotely related to his conduct to permit a finding that he was the cause of her death.

Under the New Jersey Penal Code (the New Jersey Code), causation is determined not by the common-law concept of proximate cause, but by reference to the definition of causation in *N.J.S.A.* 2C:2-3, which provides:

a. Conduct is the cause of a result when:

(1) It is an antecedent but for which the result in question would not have occurred; and

(2) The relationship between the conduct and result satisfies any additional causal requirements imposed by the code or by the law defining the offense.

b. When the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation, as the case may be, of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

c. When the offense requires that the defendant recklessly or criminally negligently cause a particular result, the actual result must be within the risk of which the actor is aware or, in the case of criminal negligence, of which he should be aware, or, if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

d. A defendant shall not be relieved of responsibility for causing a result if the only difference between what actually occurred and what was designed, contemplated or risked is that a different person or property was injured or affected or that a less serious or less extensive injury or harm occurred.

e. When causing a particular result is a material element of an offense for which absolute liability is imposed by law, the element is not established unless the actual result is a probable consequence of the actor's conduct.

As the statute makes clear, "causation" is a term of art, the meaning of which varies with the mental state of the actor. It means one thing when an offense is committed knowingly or purposely, *N.J.S.A.* 2C:2–3b, and something else for a crime of strict or absolute liability, *N.J.S.A.* 2C:2–3e, such as felony murder. Thus, "causation" assumes a different meaning from its use in ordinary discourse. *State v. Smith*, 210 *N.J.Super.* 43, 55, 509 *A.*2d 206 (App.Div.1986), *certif. denied*, 105 *N.J.* 582, 523 *A.*2d 210 (1986).

With some significant differences, the New Jersey Code is based substantially on the Model Penal Code. The underlying premise of both codes is that problems regarding variations between the actual and designed or contemplated results are problems of culpability rather than metaphysical problems of causation. II *New Jersey Code: The Final Report of the New Jersey Law Commission* § 2C:2–3 commentary at 50 (1971) (II *N.J.Code*). Consequently, in assessing whether a defendant's conduct is the cause of a remote result, both codes focus on whether the actual result justly bears on the defendant's culpability for the offense. *See Model Penal Code* § 2.03 comment at 261–63 (1985); *Model Penal Code* § 2.03 comment at 133–35 (Tent. Draft No. 4 1955).

The initial requirement for a finding of causation is that the actor's conduct must be "an antecedent but for which the result in question would not have occurred." *N.J.S.A.* 2C:2–3a(1). Under this "but-for" test, the defendant's conduct is deemed a cause of the event if the event would not have occurred without that conduct. Conversely, a defendant's conduct is not considered a cause if the event would have occurred without it. *See* W.P. Keeton, D. Dobbs, R. Keeton, & D. Owens, *Prosser & Keeton on The Law of Torts* § 41 at 266 (5th ed. 1984). Here, defendant acknowledges that the death of Quartz would not have occurred "but for" the fact that he set the fire. Instead, he relies on the additional requirement of *N.J.S.A.* 2C:2–3b that

the result be knowingly or purposely caused. For knowing or purposeful murder, the statute provides that the actual result must either be within "the design or contemplation" of the actor (sometimes subsequently described as "the designed or contemplated result") or involve "the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense" (sometimes subsequently described as "the remote result"). *N.J.S.A.* 2C:2–3b.

The actual result is "to be contrasted with the designed or contemplated (or, in the case of Subsection (3), the probable) result in terms of its specific character and manner of occurrence." *Model Penal Code and Commentaries* § 2.03 comment at 260 n. 13 (1985). If events transpired as the actor designed or knew that they would transpire, both codes presume that it is just to hold him or her culpable for the actual result. *N.J.S.A.* 2C:2–3b; *see Model Penal Code and Commentaries* § 2.03 explanatory note at 254 (1985); *Model Penal Code* § 2.03 comment at 133–35 (Tent. Draft No. 4 1955). Thus, when the actual result occurs in the same manner and is of the same character as the designed or contemplated result, the causation requirement is satisfied. Similarly, if the only difference between the two results is that a different person is injured from the one designed or contemplated, the difference is immaterial. *N.J.S.A.* 2C:2–3d; *Model Penal Code and Commentaries* § 2.03(2)(a) (1985).

Neither the Model Penal Code nor the New Jersey Code attempts to deal with every possible problem of causation. The New Jersey Criminal Law Revision Commission (the New Jersey Commission or the Commission) explained:

> Paragraph b is addressed to the case where the culpability requirement with respect to the result is purpose or knowledge. Here if the actual result is not within the purpose or the contemplation of the actor, the culpability requirement is not established unless the actual result involved the same kind of injury or harm as that designed or contemplated but the precise injury inflicted was different or occurred in a different way. Here the Code makes no attempt to

catalogue the possibilities, *e.g.,* to deal with the intervening or concurrent causes, natural or human; unexpected physical conditions; distinctions between the infliction of mortal or non-mortal wounds. It deals only with the ultimate criterion by which the significance of such possibilities ought to be judged, *i.e.,* that the question to be faced is whether the actual result is too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense. [II *N.J. Code* § 2C:2–3 commentary at 50.]

When the actual result is of the same character, but occurred in a different manner from that designed or contemplated, it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result. Although the jury may find that the defendant's conduct was a "but-for" cause of the victim's death under *N.J.S.A.* 2C:2–3a(1), it may nevertheless conclude under *N.J.S.A.* 2C:2–3b that the death differed in kind from that designed or contemplated or that the death was too remote, accidental in its occurrence, or dependent on another's volitional act to justify a murder conviction.

With respect to knowing or purposeful murder, the New Jersey Code treats death and serious bodily injury resulting in death as the same kind of injury. By definition, "serious bodily injury" includes "bodily injury which creates a substantial risk of death * * *." *N.J.S.A.* 2C:11–1. The underlying principle is that one who knowingly or purposely causes serious bodily injury resulting in death, like one who knowingly or purposely kills, manifests "extreme indifference to the value of human life." II *N.J. Code* § 2C:11–3 commentary at 156. As we recently explained, "[i]n accordance with the [New Jersey] Code's general principles of causation, the actual result—death—need not be within the design or contemplation of the actor. It is sufficient that the actor have the purpose or knowledge to cause serious bodily injury." *State v. Gerald,* 113 *N.J.* 40, 82, 549 *A.*2d 792 (1988). Thus, one who acts with the purpose or knowledge to inflict only serious bodily injury may, if the injury results in the victim's death, be found guilty of non-capital murder.

Criminal responsibility under both the New Jersey Code and the Model Penal Code depends not only on the nature of the injury, the manner in which it was inflicted, and the defendant's knowledge or purpose, but also, insofar as causation is concerned, on the relationship between the actual result and the designed or contemplated result. If the defendant did not knowingly or purposely cause death or serious bodily injury resulting in death, he or she may not be found guilty of murder. The reason is that the requisite mental state is absent. Here, for example, if the jury accepted defendant's version that he designed or contemplated causing only property damage, then it should have acquitted him of knowing or purposeful murder without reaching the question of causation. Death or serious bodily injury would not have been defendant's designed or contemplated result; nor could either result be considered "the same kind of injury or harm" as the designed or contemplated property damage.

If, however, the jury determined that the defendant acted knowingly or purposely, it should have determined the question of causation. To resolve that question, the jury should have first decided whether the actual result was the same as the designed or contemplated result. If not, the jury should have determined whether the actual result was the same kind of injury as that which was designed or contemplated and not too remote to hold defendant justly liable for Quartz's death. The comment to section 2.03 of the Model Penal Code illustrates the point:

> For example, if the defendant attempted to shoot his wife, with the result that she retired to her parents' country home and died there from falling off a horse, no one would think that he should be held guilty of murder, though he did intend her death and his attempt to kill her was a but-for cause of her encounter with the horse. Further questions must be asked, and it is the nature of those questions that is critical. The Institute decided that they should not be posed in terms of the encrusted precedents on proximate causation, by reference to doctrines of dependent supervening and independent supervening causes, and so on. The proper inquiry is not merely factual, but concerns the propriety of allowing the result to influence the criminality of the defendant or the gravity of his crime. The question is thus essentially one of culpability, and

in Subsections (2) and (3) that question is posed in terms appropriate for submission to the jury. [*Model Penal Code and Commentaries* § 2.03 comment at 258 (1985).]

Notwithstanding defendant's assertion of intervening causes, sufficient evidence existed to sustain defendant's conviction of knowing or purposeful murder. Defendant, who was angry at being ejected from Baker's apartment, admittedly started a fire in a wooden building that he knew was occupied by people who had been drinking alcoholic beverages. This, when combined with the State's proof that kerosene was used to accelerate the fire, could have led the jury reasonably to conclude that defendant's conduct was the cause of Quartz's death and that her death was not a remote result of the fire.

## IV

Before us, defendant also claims prejudicial error in the jury instructions on causation concerning the various murder counts. That issue was not raised before either the Law Division or the Appellate Division. Hence, we consider it as a matter of plain error. *R.* 2:10–2; *see State v. Green,* 86 *N.J.* 281, 289, 430 *A.*2d 914 (1981).

Correct charges are essential for a fair trial. *State v. Collier,* 90 *N.J.* 117, 447 *A.*2d 168 (1982); *Green, supra,* 86 *N.J.* at 287, 430 *A.*2d 914. A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations. Thus, the court must explain the controlling legal principles and the questions the jury is to decide. *Green, supra,* 86 *N.J.* at 288, 430 *A.*2d 914. So critical is the need for accuracy that erroneous instructions on material points are presumed to be reversible error. *State v. Grunow,* 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986); *Collier, supra,* 90 *N.J.* at 123, 447 *A.*2d 168. The need for an adequate charge on the question of causation is particularly compelling in the present case because the State and defendant offered contrasting theories of causation, each supported by expert testimony. *Green, supra,* 86 *N.J.* at 287–88, 430 *A.*2d 914. In its charge, the court

read the statutory definition of criminal homicide, *N.J.S.A.* 2C:11–3a, and, with one significant omission, substantially followed the model jury charge on purposeful and knowing murder.

The court failed to note a pregnant parenthetical statement at the conclusion of the model charge on knowing and purposeful murder: "(If causal relationship between conduct and result is an issue, see *N.J.S.A.* 2C:2–3.)." *New Jersey Supreme Court Committee on Model Jury Charges, Model Jury Charges: Title 2C, New Jersey Code of Criminal Justice* § 2C:11–3a(1) and 3a(2) (Oct. 16, 1987). Consequently, the court did not charge the jury on the issue of causation. As projected on this appeal, more clearly than it was at trial, causation, like defendant's state of mind, is a critical issue. Consistent with the State's version that defendant used kerosene to set the fire, the court instructed the jury that "causing the death or serious bodily injury must be within the design, it must be within the contemplation of the defendant." Thus, the charge tracked the prosecution's theory of the case. Defendant was entitled, however, to a charge that if the jury believed that Quartz's death occurred in a manner different from that designed or contemplated by defendant, it should decide whether her death was not too remote to have a just bearing on his liability.

Even in the absence of a request by his trial counsel, defendant was entitled to a charge consistent with his version of the facts. That charge would have supplied the legal predicate, for example, for the jury to determine whether Quartz's death was too remotely related to defendant's conduct in starting the fire to bear justly on his liability or on the gravity of his offense. *See* II *N.J.Code* § 2C:2–3 commentary at 50. The charge could have led to an acquittal or to defendant's conviction for the lesser-included offenses of manslaughter or aggravated manslaughter, offenses on which the trial court instructed the jury.

When, as here, divergent factual versions give rise to different theories of causation, the trial court should provide the jury

with appropriate instructions, depending on which version it chooses to accept. Because defendant's version was predicated on a divergence between the actual and designed or contemplated results, the court should have included an instruction that was consistent with the defendant's version. *See Green, supra,* 86 *N.J.* at 289, 430 *A.*2d 914 (citing *Kreis v. Owens,* 38 *N.J.Super.* 148, 155, 118 *A.*2d 420 (App.Div.1955)). Without that charge, the jury could not properly consider the significance of defendant's version of the facts. So essential to the jury's deliberations was the charge that the failure to provide it clearly possessed the capacity to bring about an unjust result. *See State v. Simon,* 79 *N.J.* 191, 208, 398 *A.*2d 861 (1979); *Vespe v. DiMarco,* 43 *N.J.* 430, 435–36, 204 *A.*2d 874 (1964).

The import of the charge was that the jury had a choice of finding, in accordance with the State's version of the facts, either that the death of Quartz was within defendant's design or contemplation in setting the fire and, therefore, he was guilty of murder, or that defendant should be found not guilty. The charge did not instruct the jury, for example, that even if it found defendant intended to cause serious bodily injury, defendant was not guilty of knowing or purposeful murder if Quartz's death occurred in a different manner or was too remotely related to defendant's conduct. If the jury had been properly charged, it might have found that the death of Quartz was too remotely related to defendant's design or contemplation for her death to have a just bearing on his culpability. Consistent with defendant's version of the facts, the jury might have found that Quartz would not have died but for the absence of working smoke detectors, the flammability of the astroturf carpeting, the doors of the apartment and building being left open, and Quartz's voluntary consumption of alcoholic beverages. The point is not that those alternatives are compelled by the evidence, but that the jury should have had the opportunity to consider them under proper instructions. The failure to provide those instructions compels a reversal.

■ A further deficiency was the failure of the charge to relate the conflicting factual versions to the legal issues. Causation, like criminal knowledge or intent, is often a nettlesome proposition to explain to a jury. The explanation, however, is essential if the jury is to apply the dispositive legal principles to the facts. *See Jurman v. Samuel Braen, Inc.*, 47 *N.J.* 586, 591–92, 222 *A*.2d 78 (1966). Otherwise, the jury may not be able to evaluate the facts under the appropriate legal standard and thereby determine whether the defendant is guilty of the crime charged. It is not always sufficient "simply to read the applicable provision of the Criminal Code, define the terminology, and set forth the elements of the crime." *State v. Concepcion*, 111 *N.J.* 373, 379, 545 *A*.2d 119 (1988). Particularly when the trial projects conflicting versions of the facts, the court should mold its instructions to the factual hypotheses of the parties. *Id.* at 380, 545 *A*.2d 119. An abstract statement about causation or the defendant's state of mind is not nearly so useful as one stating the same idea in the context of the various factual alternatives projected by the parties. *See* Schwarzer, *Communicating with Juries: Problems and Remedies*, 69 *Cal.L.Rev.* 731, 744 (1981). Unfortunately, in attempting to explain causation and defendant's possible mental state, the trial court failed to explain how the evidence could affect those elements.

Our perception of the significance of that deficiency is confirmed by the fact that the jury requested reinstruction on murder three times in the course of its deliberations. Indeed, in its initial request for clarification on the murder count, the foreman stated that the legal terminology "seems a bit confusing." Rather than repeating verbatim the abstract definitions provided by the model murder charge, the trial court should have used illustrative examples to highlight the distinctions in mental states and to clarify the concept of causation. *Concepcion, supra,* 111 *N.J.* at 380–81, 545 *A*.2d 119.

## V

Finally, defendant contends that the failure of the court properly to instruct the jury on the statutory elements of causation under *N.J.S.A.* 2C:2-3 resulted in an erroneous instruction on felony-murder. Because defendant did not raise this objection at trial, this, too, comes before us as a matter of plain error. *R.* 2:10-2.

The felony-murder verdict arose under *N.J.S.A.* 2C:11-3a(3), which imposes liability when

the actor, acting either alone or with one or more other persons, is engaged in the commission of * * * arson * * *, and in the course of such crime * * *, any person causes the death of a person other than one of the participants; except that in any prosecution under this subsection, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant:

(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and

(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

At common law, if the victim died during the course of the commission of the felony, the perpetrator was guilty of murder. *Wharton's Criminal Law* § 147 (C. Torcia 14th ed. 1979). Theoretically, the intent to commit the felony, even in the absence of an intent to kill, was transferred to the death of the victim. *State v. Madden,* 61 *N.J.* 377, 384, 294 *A.*2d 609 (1972); *State v. Stenson,* 174 *N.J.Super.* 402, 407, 416 *A.*2d 944 (Law Div.1980), *aff'd,* 188 *N.J.Super.* 361, 457 *A.*2d 841 (App.Div. 1982), *certif. denied,* 93 *N.J.* 268, 460 *A.*2d 671 (1983); J. Cannel, *Title 2C: New Jersey Code of Criminal Justice,* 2C:2-3 comment at 86-87 (1988). Thus, the commission of the underlying felony resulted in culpability for the death of the victim. *State v. Darby,* 200 *N.J.Super.* 327, 331, 491 *A.*2d 733 (App.Div. 1984), *certif. denied,* 101 *N.J.* 226, 501 *A.*2d 905 (1985).

More recently, felony murder has been viewed not as a crime of transferred intent, but as one of absolute or strict liability. Whether the offense is viewed as a crime of transferred intent or as one of absolute liability, the continuing justification for the felony-murder rule is that in some circumstances one who commits a felony should be liable for a resulting, albeit unintended, death. Conversely, other deaths are so remotely related to the underlying felony that the actor should not be held culpable for them. Our task is to ascertain the circumstances in which the Legislature has decided that one who commits a felony should also be culpable for a resulting death.

The historical justification for the rule is that it serves as a general deterrent against the commission of violent crimes. See II *N.J.Code* § 2C:11-3 commentary at 157. The rationale is that if potential felons realize that they will be culpable as murderers for a death that occurs during the commission of a felony, they will be less likely to commit the felony. From this perspective, the imposition of strict liability without regard to the intent to kill serves to deter the commission of serious crimes.

To the extent that the felony-murder rule holds an actor liable for a death irrespective of the actor's mental state, the rule cuts across the grain of criminal law. Generally, people are not criminally culpable for the consequences of their acts unless those consequences were intended, contemplated, or foreseeable. Because the felony-murder rule runs counter to normal rules of criminal culpability, it received careful consideration from the drafters of the Model Penal Code and from the New Jersey Commission. The drafters of the Model Penal Code objected to the rule as "a form of strict liability to which we are opposed." *Model Penal Code* § 2.01.1 (Tent. Draft No. 9 (1959)). Although it ultimately recommended retention of the rule, the New Jersey Commission stated that "principled justification in its defense is hard to find." II *N.J.Code* § 2C:11-3 commentary at 157. Ultimately, the Commission incorporated the advice of Oliver Wendell Holmes, Jr., who wrote:

> [I]f experience shows, or is deemed by the lawmaker to show, that somehow or other deaths which the evidence makes accidental happen disproportionately often in connection with other felonies, or with resistance to officers, or if on any other ground of policy it is deemed desirable to make special efforts for the prevention of such deaths, the law-maker may consistently treat acts which, under the known circumstances, are felonious, or constitute resistance to officers, as having a sufficiently dangerous tendency to put under a special ban. The law may, therefore, throw on the actor the peril, not only of the consequences foreseen by him, but also of consequences which, although not predicted by common experience, the legislator apprehends. [*The Common Law* 49 (1963).]

To comprehend the New Jersey Code's approach to felony murder, one must consider the pre-existing law, the Model Penal Code, and the New Jersey Commission's modifications of that Code. Before the enactment of the New Jersey Code, this State recognized a broad felony-murder rule. The predecessor statute provided:

> any person, [who] in committing or attempting to commit arson, burglary, kidnapping, rape, robbery, sodomy or any unlawful act * * * of which the probable consequences may be bloodshed, kills another, or if the death of anyone ensues from the committing or attempting to commit any such crime or act [was guilty of murder]. [*N.J.S.A.* 2A:113–1.]

Even under that statute, the State was required to prove not only that the felony was the cause-in-fact or "but-for" cause, but also that it was the proximate cause of the victim's death. II *N.J.Code* § 2C:2–3 commentary at 49. Thus, the proximate-cause test limited the harsh effect of the common-law felony-murder rule. Because of its vagueness, however, the test created problems of its own. *Ibid.*

The Model Penal Code took a different approach. Under the Model Penal Code, felony murder was treated as a form of negligent or reckless homicide. Instead of treating felony murder as an absolute-liability offense, the Model Penal Code created a presumption of recklessness when a homicide occurred in the course of the commission of certain felonies, including arson. *Model Penal Code and Commentaries* § 210 introductory note at 2 (1980). If not rebutted, that presumption would support a conviction for murder.

Initially, the New Jersey Commission agreed with that approach. In a tentative draft of the New Jersey Code, the Commission recommended adoption of the Model Penal Code's treatment of felony murder, concluding that "[b]eyond this, we submit that the felony-murder doctrine, as a basis for establishing the criminality of homicide, should be abandoned." *New Jersey Law Commission* (Tentative Draft at 310 (Jan. 1971)). As an alternative, the Commission mentioned the New York Code, *id.* at 313–14, which "allows a limited affirmative defense as to the non-perpetrator participant in the felony where that person is able to demonstrate that he did not assume a homicidal risk." II *N.J.Code* § 2C:11–3 commentary at 157.

In its final report, the New Jersey Commission rejected the Model Penal Code's approach and elected to follow the New York Code. Stating that "homicides will continue to constitute murder if they are committed during the course of and in furtherance of certain enumerated major crimes," *id.* at 156–57, the Commission decided that felony murder should be treated as an absolute-liability offense. The Commission, however, recognized the possible unfairness of imposing absolute liability on all perpetrators for a death that occurs in the course of the commission of a felony. Consequently, it provided an affirmative defense, similar to that provided in New York, for perpetrators who did not assume a homicidal risk. The purpose of the affirmative defense was "[to] deal with such persons in an appropriate way by holding them responsible for the felony but not for the homicide." *Id.* at 158.

In adopting the affirmative defense, the Commission recognized that not all participants in a multiple-perpetrator felony assume a homicidal risk. Consequently, an accomplice, as distinguished from the primary actor, may establish the defense by proving that he or she did not commit the homicidal act, was not armed with a deadly weapon, and had no reason to believe that any other participant was so armed or "intended to engage in conduct likely to result in death or serious physical injury." *N.J.S.A.* 2C:11–3a(3)(a) to –3a(3)(d). Those four factors focus

on whether the accomplice undertook a homicidal risk or could have foreseen that the commission of the felony might result in death. So viewed, the affirmative defense leaves unaffected the imposition of absolute liability without regard to the primary actor's intent to cause death. It merely narrows the circumstances in which an accomplice, as distinguished from the primary actor, may be liable for felony murder. Thus, when an accomplice cannot establish the affirmative defense, he or she remains strictly liable without regard to his or her intent to cause death. The nature of felony murder as an absolute-liability offense remains constant. All that changes is that an accomplice may exculpate himself or herself by establishing the limited affirmative defense.

Amendments to the felony-murder statute, *N.J.S.A.* 2C:11–3a(3), likewise leave unaffected the nature of felony murder as a crime of absolute liability. Those amendments, enacted in 1979 and 1981 in response to this Court's decision in *State v. Canola*, 73 *N.J.* 206, 374 *A.*2d 20 (1977), extend the reach of the statute.

In *Canola*, four perpetrators attempted to rob a jewelry store. During the course of the robbery, the owner killed one of the perpetrators and then was himself killed. The defendant was convicted of felony murder of both the owner and the other perpetrator. With Judge (now Justice) Handler dissenting, the Appellate Division affirmed the conviction based on the homicide of the co-felon. 73 *N.J.* at 208, 374 *A.*2d 20. Relying substantially on that dissent, we modified the judgment of the Appellate Division by reversing the conviction of the other perpetrator. *Id.* at 226, 374 *A.*2d 20.

Before this Court, the "precise issue" was whether under the prior felony-murder statute, *N.J.S.A.* 2A:113–1, a felon could be liable for the death of a co-felon caused by someone resisting the commission of the felony. 73 *N.J.* at 209, 374 *A.*2d 20. The Court held that one felon could not be so liable for the death of another felon. *Id.* at 211, 374 *A.*2d 20. According to the Court,

a felon could not be liable for any death, even of a non-felon, when the death was caused by someone other than a participant in the commission of the felony. *Id.* at 226, 374 *A.*2d 20. Thus, *Canola* limited the felony-murder rule to killings committed by a participating felon acting either as a sole perpetrator or as one of multiple perpetrators. To reach this conclusion, the Court relied in part on the Commission's proposal limiting the felony-murder rule to killings of non-participants committed by a participant "in the course of and in furtherance of [the commission of the felony]." *Ibid.*

In a concurring opinion, Justice Sullivan stated that he agreed with the result because the death was that of a co-felon, and not of "some innocent person or a police officer * * *." *Id.* at 226, 374 *A.*2d 20. The Legislature responded by amending *N.J.S.A.* 2C:11–3. That amendment eliminated the requirement that the death be caused by one of the participants and provided that the requirement was satisfied if the death was caused by "any person." *L.* 1979, *c.* 178. By making this change, the Legislature effectively adopted Justice Sullivan's concurring opinion and overrode so much of *Canola* as held that one of multiple perpetrators could not be guilty of felony murder when the death was caused by the victim.

The 1981 amendment to *N.J.S.A.* 2C:11–3 merely deleted the requirement that the death occur "in furtherance of" the commission of the felony. *L.* 1981, *c.* 290. As explained by the Senate Judiciary Committee, the Legislature's concern was that a felon might avoid liability for the death of another as not "in furtherance of" the commission of the felony if the death was caused by a non-participant such as a felony victim or a police officer. The committee statement accompanying the amendment reads:

> Under 2C:11–3, a person committing a serious crime (i.e. robbery or arson) is guilty of murder if during the course of and in furtherance of that crime a homicide occurs. This is what is commonly referred to as the "felony-murder" doctrine. The felony-murder provision is only intended to prohibit murder prosecutions in cases where the victim is a co-felon. However, including in this definition the phrase "in furtherance of" could be read to preclude prosecution

for murder in certain circumstances. For instance, when during a robbery, the shopkeeper fires at the robber but instead kills an innocent bystander, the robber might not be charged with murder because, although the killing occurred during the course of the robbery, the killing was not in furtherance of the robbery. Therefore, in order to clarify that a robber could be charged with murder under such circumstances, section 14 would delete the phrase "in furtherance of" from 2C:11–3. [Senate Judiciary Committee, *Statement to Senate Committee Substitute,* No. 1537, § 14 (1981).]

To summarize, the purpose of the 1979 and 1981 amendments was to extend the reach of *N.J.S.A.* 2C:11–3 so that the felony-murder rule would apply to homicides committed by persons other than the actor committing the felony. The extension applied whether the felony was committed by a sole actor or by one acting with accomplices. Neither amendment was intended to affect the obligation of the State to prove that the death of the victim was the result of the felon's conduct.

Concerning absolute-liability offenses, the New Jersey Code states:

When causing a particular result is a material element of an offense for which absolute liability is imposed by law, the element is not established unless the actual result is a probable consequence of the actor's conduct. [*N.J.S.A.* 2C:2–3e.]

In effect, subsection e provides that the actual result—death, in the case of felony murder—"is not established unless" it is the "probable consequence of the [commission of the felony]." *Ibid.*

Although the felony-murder section, *N.J.S.A.* 2C:11–3a(3), does not contain its own definition of causation, no such definition is needed. The reason is that *N.J.S.A.* 2C:2–3 defines causation not only for homicide, but for all crimes. It would, therefore, have been superfluous to have repeated the probable-consequence test in *N.J.S.A.* 2C:11–3a(3). That analysis is confirmed by a 1985 addition to the Model Penal Code commentary on section 2.03(4), which discussed the role of the probable-consequence test in a strict-liability offense such as felony murder:

The most important application may be in jurisdictions in which strict liability continues to play a role in determining the gravity of some offenses. Under the

felony-murder rule, for example, a person committing a felony is strictly liable for deaths caused during the felony. The principle of this subsection is that there should be no liability unless the actual result is a probable consequence of the actor's conduct. Thus, suppose the moment a bank robber stepped into the bank, an employee pushing the button for a burglar alarm was electrocuted. The robber would not be liable for the death of the employee.

In general, strict liability is based on a desire to secure extreme care in areas in which it is imposed. This objective is not significantly furthered by finding liability for improbable results, nor would such an approach be just. [*Model Penal Code and Commentaries* § 2.03(4) comment at 264.]

Recent legislative action and judicial decisions also confirm the conclusion that the probable-consequence test applies to felony murder. Legislative confirmation appears in the Comprehensive Drug Reform Act of 1987, *N.J.S.A.* 2C:35–1 to :35–23 (the Drug Reform Act). In the Act, the Legislature declared that any person who manufactures, distributes, or dispenses a controlled dangerous substance "is strictly liable for a death which results from the injection, inhalation or ingestion of that substance * * *." *N.J.S.A.* 2C:35–9a.[1] The accompanying Assembly Judiciary Committee commentary noted that "[t]he offense defined in this section is somewhat similar to the 'felony murder' provisions developed at common law and which are now codified in chapter 11 [*N.J.S.A.* 2C:11] of the penal code." *Commentary to the Comprehensive Drug Reform Act of 1986* at a–339 (Nov. 23, 1987) (Drug Act Commentary). In distinguishing strict liability under the Drug Act from such liability under the Code, the Drug Act Commentary states that under

[1]*N.J.S.A.* 2C:35–9 provides specifically:

b. The provisions of *N.J.S.A.* 2C:2–3 (governing the causal relationship between conduct and result) shall not apply in a prosecution under this section. For purposes of this offense, the defendant's act of manufacturing, distributing or dispensing a substance is the cause of a death when:

(1) The injection, inhalation or ingestion of the substance is an antecedent but for which the death would not have occurred; and

(2) The death was not:

(a) too remote in its occurrence as to have a just bearing on the defendant's liability; or

(b) too dependent upon conduct of another person which was unrelated to the injection, inhalation or ingestion of the substance or its effect as to have a just bearing on the defendant's liability.

the Act the defendant can be strictly liable even if death is not a probable consequence of his or her manufacture, distribution, or dispensing of drugs. The Drug Act Commentary states:

This section specifically establishes the element of causation which must be proved by the State in a prosecution for this offense. The element of causation specifically defined for this particular offense is patterned after the general penal code provisions found at *N.J.S.A.* 2C:2–3. Notwithstanding the provisions of subsection e of *N.J.S.A.* 2C:2–3, which would ordinarily apply with respect to strict liability offenses, however, the State need not show in a prosecution under this section that the death was a "probable consequence" of the defendant's conduct. [*Id.* at a–338.]

Until the enactment of the Drug Reform Act, felony murder was the predominant strict-liability crime in New Jersey. *State v. Whitted,* 232 *N.J.Super.* 384, 557 *A.*2d 327 (App.Div.1989). Like felony murder, a violation of the Act constitutes a first-degree offense. When comparing the causation requirement for strict liability under the Drug Reform Act to that for other crimes, the Legislature recognized it was creating an exception to the probable-consequence test applicable to such crimes. That legislative recognition supports the conclusion that felony murder is a strict-liability offense requiring proof that death was the probable consequence of the commission of the underlying felony. See *id.* at 390, 557 *A.*2d 327 ("[I]t is clear the Assembly Committee read causation in felony murder to encompass both antecedent but-for and probable consequence."). In *Whitted,* the Appellate Division reversed a conviction for felony murder because of the trial court's refusal to charge that to find the defendant guilty the jury must first find that the victim's death was the probable consequence of the underlying felony. *Id.* at 386, 557 *A.*2d 327. The reasoning of the Appellate Division in *Whitted* is consistent with its earlier opinion of *State v. Smith, supra,* 210 *N.J.Super.* 43, 509 *A.*2d 206, which antedated the Drug Reform Act. In *Smith,* the Appellate Division also concluded that for there to be a conviction for felony murder, the victim's death must be the probable consequence of the commission of the underlying felony. *Id.* at 56, 509 *A.*2d 206.

That interpretation is also consistent with the State's understanding of felony murder as manifested in its briefs in *Smith*, *Whitted*, and the instant matter. Indeed, in *Whitted*, "the State requested a charge that the jury be instructed it had to find that *but for* the burglary the victim would not have died and that his death was the *probable consequence* of the burglary." 232 *N.J.Super.* at 386, 557 *A.*2d 327. In the present case, as in *Smith*, the State has not argued that the probable-consequence test does not apply. Instead the State argues that the facts establish that the victim's death was the probable consequence of the commission of the underlying felony.

Having concluded that felony murder is an absolute-liability offense, a question remains about the meaning of "probable consequences." The source for *N.J.S.A.* 2C:2–3e was section 2.03 of the 1962 Proposed Official Draft of the Model Penal Code. As originally drafted, section 2.03 did not provide a causation standard for strict-liability offenses. *Model Penal Code* § 2.03 (Tent. Draft No. 4 1955). Distinguished scholars protested this omission as requiring nothing more than "but-for" causation for absolute-liability offenses. They recognized that it would not be just to hold an accused liable for harm that occurred "through the conjunction of his act with the deliberate act of some independent person or some quite extraordinary event." H. Hart and T. Honore, *Causation in the Law* 361 (1959); G. Mueller, *Essays in Criminal Science* 169, 185 (1960). In response to that criticism, the Model Penal Code drafters added section 2.03(4) with its probable-consequence requirement for absolute-liability offenses. *Model Penal Code* § 2.03 note at 30 (Proposed Official Draft 1962). This is the same section that was recommended by the New Jersey Commission and adopted by the Legislature as *N.J.S.A.* 2C:2–3e.

Thus, the New Jersey Commission adopted the probable-consequence test of section 2.03(4) of the Model Penal Code. Adoption of that test did not involve a significant departure from the requirements of the proximate-cause test under then-existing law. II *N.J.Code* § 2C:2–3 commentary at 49 (quoting

*State v. Reitze*, 86 *N.J.L.* 407, 92 *A.* 576 (Sup.Ct.1914)). When recommending the word-for-word adoption of section 2.03(4), with its probable-consequence test, the Commission noted:

> Subsection e [which states the probable-consequences test] is necessary to *retain* a probable consequence test for absolute liability situations because, by definition, no result is designed, contemplated or risked consciously by the defendant. [*Id.* at 51 (emphasis added).]

The term "probable consequence" is undefined in the Model Penal Code or Commentary, the New Jersey Commission Report, the New Jersey Code, or anywhere else in the legislative history. Our review of that history leads us to conclude that the Legislature, with one exception, did not intend a drastic change in the law of felony murder. The exception is the provision of an affirmative defense for accomplices who can prove that they did not assume a homicidal risk. That exception, which is part of a defendant's case, sheds no light on the meaning of "probable consequence."

Pre–Code cases originally employed the term "probable consequence" or the equivalent when referring to the risk of death created by the felon's acts. In *State v. Cooper*, the former Supreme Court stated that an unintentional killing occurring during the commission or attempt to commit a felony constitutes a felony murder, "especially if death were a probable consequence of the act." 13 *N.J.L.* 360, 370 (1833). Similarly, in *Reitze, supra*, that court held that a tavern owner was not liable for the felony murder of a drunken patron who died after falling down in the street. The court stated: "It is only for the natural and probable result of a wrongful act that a wrong-doer is liable * * *." 86 *N.J.L.* at 408, 92 *A.* 576. The Court of Errors and Appeals upheld felony-murder liability in *State v. Mule,* based on its finding that "[u]nder the circumstances, the killing was one of the natural, ordinary and probable consequences of the attempt to perpetrate the robbery * * *." 114 *N.J.L.* 384, 392, 177 *A.* 125 (E. & A. 1934).

Later cases transformed the "probable consequence" language into a "proximate cause" inquiry. See *State v. Loray,*

41 *N.J.* 131, 140, 195 *A.*2d 289 (1963) (defendant's acts were *"precipitating and contributory causes"* of victim's death); *State v. Canola,* 135 *N.J.Super.* 224, 235, 343 *A.*2d 110 (App. Div.1975) (under "proximate cause" theory of felony murder, Appellate Division found felon liable for death occurring during commission of felony "which by direct and almost inevitable consequences results from the defendant's acts"), *rev'd,* 73 *N.J.* 206, 374 *A.*2d 20 (1977); *State v. McKeiver,* 89 *N.J.Super.* 52, 55, 213 *A.*2d 320 (Law Div.1965) (defendant guilty of felony murder if "he creates any substantial human risk which would actually result in the loss of life").

In an attempt to focus more closely on the meaning of "probable consequence," we listed this case for reargument. Both the State and defendant rejected the suggestion that "probable consequence" means "more likely than not." At oral argument, defendant urged that probable consequence in the felony-murder context means variously that the victim's death must not be too remote or depend on the act of another, and that the death cannot be accidental, unanticipated, or remote. By comparison, the State contended that "probable consequence" means that the victim's death need be only foreseeable, and not the result of an independent or intervening cause. Significantly, both counsel urge that probable consequences means something more than "but for" causation. The point to be derived from prior law, the language and history of the Code, and the argument of counsel is that some deaths are too remotely related to the commission of the felony to justify holding the actor responsible not only for the commission of the felony, but for murder.

As previously noted, the "probable consequence" standard derives from the Model Penal Code. The Model Penal Code Commentary supports the proposition that the meaning of "probable consequence" is closely related to the concept of foreseeability. In the commentary to the accomplice-liability section of the Model Penal Code, 2.06, the commentators recognize that the "probable consequence" test is substantially sim-

ilar to a test of foreseeability. As they observe: "To say that the accomplice is liable if the offense committed is 'reasonably foreseeable' or the 'probable consequence' of another crime is to make him liable for negligence." *Model Penal Code and Commentaries* § 2.06 at 312 n. 42 (1985). Although not directly related to felony-murder analysis, the commentary lends support to the interchangeability of the terms "probable consequence" and "reasonable foreseeability."

Keeping in mind that the New Jersey Commission predicated its version of the felony-murder rule on New York law, the causation test developed by the New York courts is illuminating. Those courts have rejected the notion that "but-for" causation is sufficient to sustain a felony-murder conviction. *People v. Cable*, 96 *A.D.*2d 251, 256–60, 468 *N.Y.S.*2d 470, 474 (1983), *rev'd on other grounds sub nom. Matter of Anthony M.*, 63 *N.Y.*2d 270, 471 *N.E.*2d 447, 481 *N.Y.S.*2d 675 (1984); *People v. Flores*, 124 *Misc.*2d 478, 479–82, 476 *N.Y.S.*2d 478, 480–81 (Sup.Ct.1984). To find a defendant guilty of felony murder, New York courts require that the "death [be] a reasonably foreseeable and non-accidental consequence" of the felony. *Flores, supra,* 124 *Misc.*2d at 481, 476 *N.Y.S.*2d at 480. This requirement is particularly significant because the New York Code does not contain a causation provision parallel to *N.J.S.A.* 2C:2–3. Thus, even in a state where the legislature has not provided a standard of causation for crimes of absolute liability, the courts have read into the statute notions of foreseeability.

In sum, pre-Code case law and the Model Penal Code draw on notions of foreseeability. To the extent that the Legislature looked to those sources, "probable consequence" may be interpreted in their light. The Legislature, however, also wanted to avoid "proximate cause" terminology. II *N.J.Code* § 2C:2–3. We believe we can resolve the dilemma by defining "probable consequence" by recourse to the terms used to define causation in 2C:2–3 for crimes committed knowingly, purposely, or recklessly, or with criminal negligence. For those offenses, in addition to other prescribed requirements, the result must "not

be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or the gravity of his offense." *N.J.S.A.* 2C:2–3b and –3c. As previously noted, however, the Legislature amended *N.J.S.A.* 2C:11–3 to provide that culpability for felony murder may attach when the killing is committed by one other than the felon, such as the victim or a police officer. As that amendment intimates, such killings are not "[too] dependent on another's volition to have a just bearing on the actor's liability." In brief, deaths occurring as a result of self-defense or retaliation are not "too dependent on another's volition," but are the foreseeable result of the risk created by the felon. Although the legislative intent is not entirely clear, we conclude that the Legislature recognized that some deaths will occur in the course of a felony that are too remotely related or accidental to warrant holding the actor liable.

█ We note the absence from the Model Criminal Jury Charges of a specific charge on causation in the felony-murder context. Although we cannot provide in this opinion a single charge suitable for all cases, we offer the following summary as a guide for trial courts. The court should instruct the jury that the defendant, whether a sole perpetrator or an accomplice, is liable for felony murder only if the death is not too remote, accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on the defendant's culpability.

Two examples define the outer limits of the problem. On the one hand, a bank robber would not be liable for felony murder if at "the moment a bank robber stepped into the bank, an employee pushing the button for a burglar alarm was electrocuted." *Model Penal Code and Commentaries* § 2.03(4) comment at 264 (1985). On the other hand, in a robbery of a store in which "the shopkeeper fires at the robber but instead kills an innocent bystander," the death would not too remote for the defendant to be guilty of felony murder. Senate Judiciary

Committee, *Statement to Senate Committee Substitute*, No. 1537, § 14 (1981). The legislative history makes it clear that under those circumstances the killing is not too remote and that, if the jury finds that the victim's death would not have occurred "but for" the commission of the felony, the causation test is satisfied.

As the foregoing examples illustrate, in a multiple-perpetrator felony, the focus should be on the relationship between the victim's death and the felony, not the individual roles of the various perpetrators. Hence, in such a felony, an otherwise culpable accomplice may be liable for the death of the victim even if he or she was not the gunman who killed the victim, but was merely a lookout for the driver of a getaway car. The point is that a defendant should be exculpated only when a death occurs in a manner that is so unexpected or unusual that he or she could not justly be found culpable for the result. The drafting of an appropriate charge is of sufficient importance to merit further consideration of our Committee on Model Criminal Jury Charges, to which we refer the issue.

Because *N.J.S.A.* 2C:2–3e requires that an actual result must be the probable consequence of the defendant's conduct, a charge on causation is essential. In the instant case, the trial court failed to instruct the jury that defendant would not be liable for the felony murder of the victim if her death was "too remote, accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on the defendant's culpability." *Supra* at 32, 573 *A.*2d at 1375. Instead, the trial court instructed the jury:

> Now, under this law [felony murder] it does not matter whether the act which caused death is committed recklessly or unintentionally or accidentally. The perpetrator is as guilty of murder as he would be if he had purposely or knowingly committed the act which caused the death.

The court concluded its felony-murder charge by stating:

> In summary, if you find after a consideration of all of the evidence that the State has proven to your satisfaction beyond a reasonable doubt that, number one, the defendant committed the crime of arson; number two, that the death of Barbara Quartz was caused by the defendant; and, number three, that the

death of Barbara Quartz was caused while the defendant was engaged in the course of the commission of the crime of arson, then you will find the defendant guilty of felony murder.

A correct charge would have instructed the jury that it must find not only that defendant committed the crime of arson and that the death of the victim occurred in the course of that crime, but also that her death would not have occurred but for the fire set by defendant and that her death was not too remote or accidental in its occurrence.

When, as here, causation is at issue, the failure of the court to instruct the jury on that issue has the clear capacity to produce an unjust result. By not providing a definition of causation, the trial court left the jury "without the legal implements to reach and form a verdict." *State v. Wynn,* 21 *N.J.* 264, 271, 121 *A.*2d 534 (1956); *Smith, supra,* 210 *N.J.Super.* at 55, 509 *A.*2d 206; *see Commonwealth v. Rhoades,* 379 *Mass.* 810, 401 *N.E.*2d 342, 344 (1980) (reversal of felony-murder conviction for causing death of firefighter who died from coronary thrombosis after working to extinguish fire because trial court had "failed to describe adequately the causal connection which must exist between a defendant's act and a person's death in order for the Commonwealth to obtain a conviction on the theory of felony murder"). It may be that another jury confronted with the same evidence will reach the same result. Defendant, however, is entitled to a fair trial. Sustaining the verdict in the face of an incorrect charge would deprive him of that right.

In sum, we find that sufficient evidence was produced at trial for a jury to conclude that defendant purposely or knowingly caused death or serious bodily injury resulting in death, contrary to *N.J.S.A.* 2C:11–3a(1), (2). Because the trial court did not adequately charge the jury on causation under *N.J.S.A.* 2C:2–3, we reverse the judgment of conviction for murder, and remand the cause to the Law Division.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.